Nos. 24-1048 and 24-1082

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ERIKA MABES and BRIAN MABES, individually
and on behalf of L.M., J.R.M., and J.A.M.,
minor children,
*Plaintiffs-Appellees*,
v.
ANGELA MCFEELEY, et al.,
*Defendants-Appellants*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:21-cv-2062-JRS-MKK,
The Honorable James R. Sweeney, II, Judge.

**BRIEF OF STATE APPELLANTS AND REQUIRED SHORT APPENDIX**

THEODORE E. ROKITA
Indiana Attorney General

JUSTIN F. ROEBEL
Deputy Attorney General

Office of Indiana Attorney General
Todd Rokita
Indiana Government Center South,
    Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-7635
Fax: (317) 232-7979

Counsel for Appellants *Angela
McFeeley, Natasha Davis, Courtney
Oakes, Samantha King, Hannah
Lyman, Kristin Miller, Courtney
Crowe, and Jaclyn Allemon*

# TABLE OF CONTENTS

Table of Authorities ............................................................................iv

Jurisdictional Statement ......................................................................1

Statement of the Issue ........................................................................2

Statement of the Case .........................................................................2

      A. Mabes' two-month-old son L.M. was hospitalized with a report
         that he was unresponsive and in respiratory distress after
         being found sleeping face down. A CT scan showed a skull
         fracture and brain damage ...............................................................3

      B. DCS received a report of suspected child abuse and neglect
         regarding the Mabes' children and investigated that report ..............4

      C. DCS removed the Mabes' children from their parents that
         same day ...........................................................................................7

      D. DCS filed CHINS petitions for each child; the removal was
         affirmed by the juvenile court .........................................................8

      E. The case was reassigned, and the investigation continued ................9

      F. On October 25, 2019, the CHINS proceeding concluded with
         an agreed final judgment that Brian committed neglect and
         that the children were in need of services ........................................11

      G. Erika pursued a CAPTA administrative appeal that ended
         when DCS unsubstantiated the claims ............................................12

      H. The Mabes brought the present lawsuit .........................................15

Summary of the Argument ...............................................................19

      Standard of Review .........................................................................20

Argument:

      The DCS Defendants did not violate clearly-established law ..................21

      A. The district court failed to properly evaluate any of the DCS

Defendants' qualified immunity claims .................................................23

B. DCS Defendants did not violate clearly established law by removing the children from the Mabes home on an emergency basis .................................................................................................25

   i. Probable cause supported the emergency seizure .........................27

   ii. DCS Defendants considered the totality of the circumstances and did not ignore innocent explanations .......................................30

C. DCS Defendants are entitled to qualified immunity with regard to the CHINS petition .................................................................33

   i. DCS Defendants are entitled to qualified immunity because none of the alleged misrepresentations or omissions were necessary to a finding of probable cause .........................................34

   ii. The Mabes have presented no evidence showing intentional misrepresentation .............................................................................37

      1. A "history of unsafe sleep" was "a reasonable explanation for his hypoxic brain injury" .....................................................38

      2. L.M.'s skull fracture was a life-threatening condition ..............39

      3. L.M.'s skull fracture could only have been caused by non-accidental trauma inflicted upon him .................................40

      4. L.M. suffered "life threatening injuries ... that have no plausible explanation" .............................................................40

      5. L.M.'s abdominal bruise was a sign of physical abuse .............41

      6. L.M.'s injuries had no plausible explanation ...........................41

      7. The surface that L.M. was on when he had his seizure was "extremely soft" .........................................................................42

            *     *     *

      1. L.M. presented with a "goose egg" or "knot" on his head ..........43

      2. Brian admitted to using illegal substances when he was the only adult with the children .................................................44

    D.  DCS Defendants are entitled to qualified immunity for their participation in the administrative review...........................................45

    E.  DCS Defendants are entitled to qualified immunity where there is no evidence of personal involvement..................................................48

Conclusion........................................................................................................50

Fed. R. App P. 32(g) Word Count Certificate ........................................................51

Certificate of Compliance with Circuit Rule 30(D) .............................................52

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Sangamon County, Ill.*, 705 F.3d 706 (7th Cir. 2013) ................................ 22

*Anderson v. Creighton*, 483 U.S. 635 (1987) ....................................... 21, 24

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .................................... 21, 22, 24, 28

*Bond v. Aguinaldo*, 228 F.Supp.2d 918 (N.D. Ill. 2002) ............................. 38

*Boyd v. Owen*, 481 F.3d 520 (7th Cir. 2007) ................................................ 46

*Brokaw v. Mercer Cnty.*, 235 F.3d 1000 (7th Cir. 2000) .......................... 25, 30, 31, 33

*Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532 (1985) .................................. 46

*Day v. Wooten*, 947 F.3d 453 (7th Cir. 2020) ................................................. 20

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ......................... 26, 31, 33

*Doe v. Heck,* 327 F.3d 492 (7th Cir. 2003) .................................................. 22

*Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005) ................................. 45, 46

*Flowers v. Renfro*, 46 F.4th 631 (7th Cir. 2022) ......................................... 20

*Gaither v. Anderson*, 236 F.3d 817 (7th Cir. 2000) .................................... 48

*Gant v. Hartman*, 924 F.3d 445 (7th Cir. 2019) ......................................... 21

*Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017) .............................. 45

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ....................................................... 47

*Gottlieb v. Cnty. of Orange*, 84 F.3d 511 (2d Cir. 1996) .............................. 31

*Gutierrez v. Kermon*, 722 F.3d 1003 (7th Cir. 2013) ................................. 21

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .................................................. 21

*Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463 (7th Cir. 2011) ............... *passim*

*Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006) ................................... 38

*Jones v. Clark*, 630 F.3d 677 (7th Cir. 2011) .............................................. 1

*Kemp v. Liebel*, 877 F.3d 346 (7th Cir. 2017) .............................................................. 32

*King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 2020 WL 1531356
    (7th Cir. 2020)............................................................................................................. 2

*Leaver v. Shortess*, 844 F.3d 665 (7th Cir. 2016) .......................................................... 35

*Mabes v. McFeeley*, 2023 WL 8878427 (S.D. Ind. Dec. 22, 2023)............................... 18

*Malley v. Briggs*, 475 U.S. 335 (1986) .......................................................................... 22

*McGee v. Parsano*, 55 F.4th 563 (7th Cir. 2022)............................................................ 1

*Millspaugh v. Cnty. Dep't of Pub. Welfare of Wabash Cnty.*, 937 F.2d 1172
    (7th Cir. 1991)........................................................................................................... 32

*Mitchell v. Forsyth*, 472 US. 511 (1985) ........................................................................ 1

*Patrick v. City of Chicago*, 81 F.4th 730 (7th Cir. 2023) ............................................. 11

*Pearson v. Callahan*, 555 U.S. 223 (2009) .................................................................... 22

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ..................................................................... 1

*Rainsberger v. Benner*, 913 F.3d 640 (7th Cir. 2019) ................................................... 20

*Saucier v. Katz*, 533 U.S. 194 (2001)....................................................................... 24, 25

*Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497 (7th Cir. 1999).................. 45

*Sebesta v. Davis*, 878 F.3d 226 (7th Cir. 2017) ...................................................... 22, 47

*Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021)............................................... 21, 23, 24

*Stanton v. Sims*, 571 U.S. 3 (2013) ........................................................................ 28, 30

*Stewardson v. Biggs*, 43 F.4th 732 (7th Cir. 2022).................................................... 20

*Taylor v. Hughes*, 26 F.4th 419 (7th Cir. 2022) ............................................. 33, 34, 37

*United States v. Mullins*, 803 F.3d 858 (7th Cir. 2015)............................................... 35

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000) ........................................................ 31

*White v. Pauly*, 580 U.S. 73 (2017).......................................................................... 24, 25

*Whitlock v. Brown*, 596 F.3d 406 (7th Cir. 2010) ........................................................ 34

*Estate of Williams by Rose v. Cline*, 902 F.3d 643 (7th Cir. 2018)............................ 49

*Wood v. Moss*, 572 U.S. 744 (2014)............................................................. 25

## Statutes

28 U.S.C. §1291.......................................................................... 1

28 U.S.C. §§ 1331 and 1343............................................................. 1

42 U.S.C. §1983...................................................................*passim*

42 U.S.C. §5101, *et seq.*............................................................. 12

Ind. Code § 31-34-1-1.............................................................. 8, 12

Ind. Code § 31-34-5-3(a)............................................................. 35

Ind. Code § 31-34-9-2(2)............................................................. 35

## Other Authorities

U.S. Const. amend. IV ............................................................ 15, 33

U.S. Const. amend. XIV...........................................................*passim*

https://safetosleep.nichd.nih.gov/reduce-risk/back-sleeping
    (lasted visited April 9, 2024) .................................................. 7

## JURISDICTIONAL STATEMENT

Erika and Brian Mabes, individually and on behalf of their minor children L.M., J.R.M., and J.A.M., filed suit against Angela McFeeley, Natasha Davis, Courtney Oakes, Samantha King, Hannah Lyman, Kristin Miller, Courtney Crowe, Jaclyn Allemon, Dr. Shannon Thompson, and IU Health under 42 U.S.C. § 1983 for alleged violations of their Fourth and Fourteenth Amendment rights after their children were removed from their care as part of a child-welfare investigation (R. 1). IU Health was later dismissed from the suit without prejudice (App. 48). The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because plaintiffs allege a violation of their federal civil rights. On December 22, 2023, by order and entry on the docket, the district court denied the plaintiffs' and the defendants' motions for summary judgment, including the defendants' claim to qualified immunity from suit (App. 8).

Defendants McFeeley, Davis, Oakes, King, Lyman, Miller, Crowe, and Allemon ("DCS Defendants") timely filed their notice of appeal on January 19, 2024 (R. 364). This Court has appellate jurisdiction under 28 U.S.C. § 1291 over the denial of qualified immunity under the collateral order doctrine when the question presented is one of law, either because the facts are undisputed or the appellant has taken each disputed fact in the light most favorable to the plaintiff. *E.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014); *Mitchell v. Forsyth*, 472 US. 511, 530 (1985); *McGee v. Parsano*, 55 F.4th 563, 572 (7th Cir. 2022); *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011).

## STATEMENT OF THE ISSUE

The district court denied the Indiana Department of Child Services ("DCS") Defendants qualified immunity at summary judgment finding there are jury questions regarding whether the DCS Defendants "should have credited, or at least further considered, the Mabes' innocent explanation of events" before taking action, whether an emergency existed requiring immediate removal, and whether that removal improperly continued after probable cause of abuse dissipated. But these claims turn on issues of law. Instead of hastily denying qualified immunity, the district court should have determined whether reasonable suspicion and probable cause existed based on the undisputed facts and reasonable inferences favorable to the Mabes. By improperly denying qualified immunity based on the decision to pursue an investigation, the district court also failed to meaningfully consider whether DCS Defendants were entitled to qualified immunity for their subsequent actions in the CHINS proceedings and administrative review. The district court also failed to consider whether the individual defendants were personally involved.

Thus, the issue on appeal is whether the DCS Defendants are entitled to qualified immunity from this suit.

## STATEMENT OF THE CASE

To the extent the facts relevant to summary judgment may be disputed, they are viewed in the non-movant Mabes' favor. *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 984, 2020 WL 1531356 (7th Cir. 2020). The DCS Defendant appellants are Angela McFeeley, Natasha Davis, Courtney Oakes,

Samantha King, Hannah Lyman, Kristin Miller, Courtney Crowe, and Jaclyn Allemon. Each DCS Defendant was sued individually for actions alleged to have occurred while "acting under color of state law by virtue of her position with DCS" (R. 1 at 2-4, §§ 9-16). The appellees, Erika and Brian Mabes, are the parents of J.A.M, born in 2015, and twins L.M. and J.R.M., born in May of 2019 (R. 1 at 1, § 1).

**A. Mabes' two-month-old son L.M. was hospitalized with a report that he was unresponsive and in respiratory distress after being found sleeping face down. A CT scan showed a skull fracture and brain damage.**

In July of 2019, the Mabes had recently moved to Indiana where Erika was beginning a plastic surgery fellowship at Indiana University Health (R. 11 at 1, 209-15 at 26, 228-1 at 5). Erika worked long shifts, while Brian was "responsible for essentially all of the domestic tasks including "cooking, the cleaning, … feeding the kids, getting them dressed, … typical things that a stay-at-home parent would do" (R. 208-9 at 9, 208-10 at 25, 209-15 at 22, 29).

On the night of July 19-20, 2019, Brian recalled that around midnight Erika was sleeping in her bedroom and he was up with the children and watching television (R. 209-15 at 2). He placed two-month-old L.M. on his stomach on a blanket, on top of a "pack-and-play insert," that was on top of a memory foam mattress topper because the child "was being a little fussy on his back" (R. 208-9 at 59-61). Brian fell asleep while watching television and woke up about a half an hour later to find L.M.'s head turned face down into the blanket (R. 208-9 at 61-62, 209-15 at 2-3). The child was non-responsive and limp but still breathing "kind of labored" (Tr. 209-15 at 3). When the child's condition did not improve "after about

3

15 minutes," Brian decided to wake up Erika, and they then called 911 (R. 209-15 at 3-4, 24).

L.M. was taken to the Hendricks Regional Hospital ("HRH") by ambulance in severe respiratory distress with "grunting respirations," his eyes closed, paleness, and stiffness (R. 1 at 1, 208-10 at 41, 228-8 at 5-7). Attempts to intubate the child at the hospital were complicated by "copious amounts of vomiting," and the child was finally intubated on the third attempt (R. 228-8 at 7). During intubation, the child had an episode of bradycardia, and chest compressions were performed (R. 228-8 at 7). Erika and Brian were present during the compressions (R. 228-8 at 8). At 3:20 a.m., the child was transported by helicopter to Riley Hospital for Children in Indianapolis (R. 228-8 at 8, 21). A CT scan of L.M.'s head occurred at Riley Hospital, and he was found to have a skull fracture and anoxic brain injury that "could represent nonaccidental trauma" (R. 209-2 at 8, 229-20 at 2-3). The treating doctor also observed bruising on the child's right lateral abdomen (R. 209-2 at 4, 229-20 at 6).

## B. DCS received a report of suspected child abuse and neglect regarding the Mabes' children and investigated that report.

Indiana DCS became involved on July 20, 2019, after receiving a preliminary report from Riley Hospital of alleged child abuse or neglect claiming that L.M. was in his parents' care, suffered a skull fracture, was having difficulty breathing, and had abdominal bruising (R. 209-1 at 2). Defendant Family Case Managers ("FCM") Davis and Oakes were dispatched to Riley Hospital as the on-call Family Case Managers (R. 208-1 at 1, 208-2 at 1). When they arrived at the hospital, L.M.

remained unconscious and intubated (R. 208-1 at 1). FCM Davis talked to Drs. Vida Ackerman and Shannon Thompson (No. 208-2 at 3).[1] Dr. Ackerman said CT scans showed L.M.'s abdomen to be "abnormal" and that his head had a "Y" fracture and a severe abnormal brain injury (R. 208-2 at 3). Dr. Ackerman expressed concern that the skull fracture and abdominal bruising did not match the unsafe sleep or swaddling explanation (R. 208-2 at 3). Dr. Thompson similarly indicated that Erika provided an explanation of swaddling for L.M.'s abdominal bruising that was "highly suspicious" (R. 208-2 at 3).

The Mabes were interviewed at the hospital by FCM Davis and Hendricks County Sheriff's Detective Charles Tyree (R. 208-2 at 2, 208-4 at 2, 208-11 at 33, 209-15). During the taped statements, Brian described placing L.M. on a foam mattress topper and falling asleep:

> I think I fell asleep about 30 minutes, but at that time I had put him, um, we have a memory foam mattress topper right out of the living room. It's just sitting there. It's kind of soft for him. And so I had him on that. He was being a little fussy on his back, so I rolled him over on his stomach. … I woke up about a half hour later, he was no longer turned, his head was down … he was, you know, just non-responsive. He was limp.

(R. 209-15 at 3). The Mabes also discussed prior injuries L.M. suffered including a dropping incident where Brian fell asleep holding the child, interactions with L.B.'s older sibling J.A.M. including J.A.M. hitting L.M. on the head with a toy dinosaur, and finding a "goose egg" on the child's head a few weeks earlier (R. 209-15 at 7-9,

---

[1] The Mabes dispute the truth of some of the doctors' assertions, but they did not dispute that the assertions occurred (R. 231 at 32). They also dispute whether Erika provided additional explanations for the injuries (R. 231 at 32).

36-39, 42). FCM Oakes attempted to interview four-year-old J.A.M., but the child "presented shy and would not talk" (R. 209-13 at 9).

Following the interviews, Detective Tyree received consent from both Erika and Brian to search the Mabes' home (R. 208-11 at 44). One of the bedrooms smelled of marijuana, and police found drugs and drug paraphernalia including oxycodone not prescribed to anyone residing in the home, two smoking devices, a scale, and marijuana (R. 208-11 at 46-52, 56). Brian admitted that he used the Oxycodone and marijuana in the home for his back pain and refused to submit to drug screening (R. 208-1 at 2). Detective Tyree then received search warrants for the home and for Brian and Erika's phones (R. 208-11 at 47, 55-56).

Around midday on July 20, 2019, Dr. Thompson talked to FCM Davis and Erika as part of a Riley Hospital Child Protection Team consultation (R. 208-2 at 3, 209-2 at 1). Dr. Thompson showed Erika L.M.'s skull fracture and explained it could not be caused simply by the child being dropped and would have been inflicted (R. 208-2 at 3-4, R. 208-10 at 51). Erika responded by providing "various explanations for the injury including J.A.M. dropping the child, being hit by toys, or the child falling or running into a corner (R. 208-2 at 4). During a private meeting with FCM Davis, Dr. Thompson advised that L.M.'s injuries did not align with Erika's explanations and that she classified L.M.'s skull fracture, abdominal bruising, and brain injuries as "highly suspicious for non-accidental injury" (R. 208-2 at 4).[2]

---

[2] The Mabes dispute the truth of some of the doctor's assertions and claim the conclusions were premature, but they did not dispute that the assertions occurred (R. 231 at 33). The Mabes do deny that they provided an "unsafe sleep arrangement," but they also

**C.**    **DCS removed the Mabes' children from their parents that same day.**

FCMs Davis and Oakes provided regular updates to FCM Supervisor Hannah Lyman (R. 208-4 at 2). Following the initial investigation on July 20, 2019, FCM Supervisor Lyman and non-party DCS Local Office Director ("LOD") Harmony Jensen made the decision that the Mabes children required emergency removal (R. 208-4 at 2-3). They based this on L.M.'s life-threatening condition including multiple independent injuries, lack of plausible explanations, and the high suspicion of non-accidental injury (R. 208-4 at 2). They also relied on the evidence of illegal drugs (marijuana and unprescribed prescription pain medication) found in the home; that the main caregiver of the children, Brian, admitting to using illegal drugs in the home; and the failure to follow safe sleep practices (R. 208-4 at 3).[3] They believed the children "were in imminent danger if they remained in the care of Brian and Erika over the weekend" and noted that the children were too young to ensure their own safety (R. 208-4 at 3). At the time, the Hendricks County juvenile court did not have a mechanism to contact a judge outside of normal court hours for an emergency removal (R. 208-5 at 2).

---

acknowledge that Brian fell asleep after placing L.M. stomach-down on the mattress (R. 231 at 31). Thus, an unsafe sleep practice occurred at least at the time of L.M.'s medical emergency. *See* https://safetosleep.nichd.nih.gov/reduce-risk/back-sleeping (lasted visited April 9, 2024) ("The most effective action that parents and caregivers can take to reduce baby's risk of Sudden Infant Death Syndrome (SIDS) and other sleep-related death is to always place baby on their back to sleep, for naps and at night.").

[3] The Mabes dispute the need for removal, but they do not dispute the facts regarding how the decision to remove occurred (R. 231 at 33).

The emergency placements occurred with family members based on the recommendations of Erika and Brian (R. 209-13 at 7). Initially, the plan was for L.M.'s siblings to remain with Erica's mother, but then Erika asked for J.A.M. and J.R.M. to be separated to "ease the burden" on her mother (R. 208-10 at 62, 209-13 at 7).

**D. DCS filed CHINS petitions for each child; the removal was affirmed by the juvenile court.**

On Sunday, July 21, 2019, DCS received a formal assessment from Dr. Thompson chronicling L.M.'s care and indicating that L.M. had a "grave prognosis" and had suffered a "poorly-explained" skull fracture, "poorly-explained" abdominal bruising that is "highly suspicious for inflicted injury," and suffered a constellation of brain injuries that were classified as "highly suspicious for nonaccidental trauma" (R. 208-2 at 4-5, 208-4 at 2, 209-2 at 9, 12). The report also noted a "[h]istory of unsafe sleep" and the prior incident where Brian reported falling asleep while holding L.M. and dropping the child (R. 209-2 at 9).

That day, CHINS (Child in Need of Services) petitions for each child were prepared and signed (R. 208-2 at 5-6, 209-14). Each CHINS petition was accompanied by a "Preliminary Inquiry" filing that provided the probable cause for the emergency removal of the children (R. 209-13). Each petition alleged the child was a CHINS under Indiana Code section 31-34-1-1 based on the "child's physical or mental condition [being] seriously impaired or seriously endangered as a result of … inability, refusal, or neglect" and that "the child needs care, treatment, or rehabilitation that the child is not receiving; and is unlikely to be provided or

accepted without the coercive intervention of the Court" (R. 209-14). Each CHINS petition was signed by FCM Davis, and each Preliminary Inquiry was signed by FCM Davis and FCM Supervisor Lyman (R. 209-13, 209-14). The CHINS petitions and Preliminary Inquiries were then filed in the Hendricks County Superior Court on the morning of Monday, July 22, 2019 (R. 209-13, 209-14).

At a hearing the same day, Erika and Brian were represented by counsel and were notified of their rights (R. 209-5 at 3-6, 8). The court found that "the detention was authorized and that DCS was unable to offer any family services to prevent removal due to the emergency nature of the situation" (R. 208-4 at 4, 209-5 at 39, 209-6). The court authorized continued detention "to keep the children safe at this time" and noted the history of unsafe sleeping and Brian's marijuana use (209-5 at 39, 209-6).

**E. The case was reassigned, and the investigation continued.**

Also on July 22, 2019, the Mabes' case was reassigned from the on-call FCMs to FCM Angela McFeeley (R. 208-3 at 1, 208-4 at 4, 209-5 at 82). Over the following week, FCM McFeeley continued the investigation by obtaining and reviewing L.M.'s medical records from Riley Hospital and HRH, L.M.'s records from a prior visit to Riley Hospital, and records from L.M.'s birth (R. 803-3 at 2-5). She continued contact with Riley Hospital regarding L.M.'s ongoing care and was told by Dr. Thompson that L.M. had suffered a laceration or tear in his brain tissue from a "high energy impact" as well as the fracture, and that those injuries could not have been caused by an accidental bump, a plastic toy, or dropping (R. 208-3 at 3). Dr.

Thompson also said the abdominal bruising was from squeezing and could not have been caused by swaddling (R. 208-3 at 3). On July 24, 2019, Dr. Thompson further informed FCM McFeeley that a bone survey of L.M. occurred that revealed multiple rib fractures, a corner fracture in his right humerus, and dislocations between the child's knees and femur bones and arms and shoulders (R. 208-3 at 3). Dr. Thompson said these dislocations could be from violently jerking the child (R. 208-3 at 3). Dr. Thompson told FCM McFeeley that the rib fractures were not consistent with injuries from CPR (R. 803-3 at 5).[4]

Also that week, FCM McFeeley learned that Riley Hospital had reviewed CT scans from HRH of L.M.'s twin, J.R.M., and found it also showed a skull fracture (R. 208-3 at 4). After a second CT scan, Dr. Thompson told FCM McFeeley that Riley Hospital had confirmed J.R.M.'s skull fracture (R. 208-3 at 4-5).

FCM McFeeley additionally reviewed police reports and discussed the case with Detective Tyree (R. 803-3 at 2-3). Detective Tyree provided FCM McFeeley with text messages from Brian's phone where Brian described his drug use and arranged purchases of marijuana (R. 208-3 at 2, 209-4). On July 13, 2019, Brian messaged a person identified as "Eddie" with his new address and stated he wanted "3 sativa 2 hybrid" (R. 209-4 at 16-17). Brian also arranged to have Eddie send "8S 7H" to another person (R. 209-4 at 16-18, 41-43). On the afternoon of July 19, 2019, hours before L.M.'s medical emergency, Brian sent a text message confirming receipt of his marijuana shipment and then sent a message at 5:27 p.m. stating

---

[4] The Mabes did not dispute that this conversation occurred (R. 261 at 3)(collecting undisputed allegations).

"Blowin fat clouds over here" (R. 208-3 at 2, 209-4 at 19). The next day, Erika texted Brian that "They found your marijuana. This is all terrible now" (R. 209-4 at 34, R. 208-3 at 2).[5]

In the following few weeks, FCM McFeeley continued her investigation by meeting with the Mabes and reviewing the medical records for four-year-old J.A.M. (R. 208-3 at 5-6). On July 29, 2019, Erika asked FCM McFeeley if the damage could have been caused by violent CPR (R. 228-6 at 57-58). FCM McFeely had not received any "characterization of the CPR" at HRH prior to that question (R. 228-6 at 57-58).

FCM McFeeley ultimately proposed that DCS substantiate the allegations of neglect against Brian and Erika for all three children and abuse for L.M. and J.R.M. (R. 208-3 at 6). Those recommendations were approved by FCM Supervisor Lyman (R. 208-4 at 6).

**F. On October 25, 2019, the CHINS proceeding concluded with an agreed final judgment that Brian committed neglect and that the children were in need of services.**

The CHINS proceeding was resolved on October 25, 2019, with the Mabes and DCS entering into an agreed judgment (R. 209-7). Through the agreed entry, Erika and Brian both admitted, and the trial court found, that L.M. was seriously injured, that Brian had neglected all three Mabes children thereby seriously

---

[5] Brian was later charged in Hendricks County Superior Court with neglect of a dependent as a level 3 felony, neglect of a child as a Level 6 felony, and possession of a narcotic drug as a Level 6 felony. *State v. Mabes*, No. 32D04-2003-F3-11. He pled guilty in that case to possession of a narcotic drug as a Level 6 felony pursuant to a plea agreement that required the State to dismiss the remaining charges. *Id*. This Court may take judicial notice of state court records. *Patrick v. City of Chicago*, 81 F.4th 730, 734 (7th Cir. 2023).

impairing or endangering their physical or mental health, that the children were in need of court intervention, and that a finding that the children were in need of services was in the children's best interest (R. 209-7). The agreement included no finding regarding Erika and preserved her ability to challenge her status under the Child Abuse Prevention and Treatment Act., 42 U.S.C. § 5101, *et seq.*:

> The parties specifically agree that there are no findings or determinations with regard to Mother's culpability under [Indiana Code Section] 31-34-1-1 [Indiana's neglect statute], that her right to the CAPTA Administrative Appeal Process is preserved, and on that basis Mother and Father knowingly and voluntarily waive their right to a fact finding hearing.

(R. 209-7 at 1). The agreement stated that the "parties further understand that this is a Final and Appealable Order and in any event does not obviate Mother's rights outlined herein to pursue a CAPTA appeal" (R. 209-7 at 2). At a hearing to accept the agreed judgment, Brian and Erika testified that they agreed with the terms of the agreed entry (R. 209-5 at 129-37). Following the completion of the CHINS proceedings, J.A.M. was reunified with the Mabes on March 5, 2020, and L.M. and J.R.M. were reunified on May 29, 2020 (ECF No. 209-9 at 1, 3, 5).

## G. Erika pursued a CAPTA administrative appeal that ended when DCS unsubstantiated the claims.

On or about October 15, 2019, while the CHINS proceeding was still pending in Hendricks Superior Court, LOD Courtney Crowe sent Erika a Notice of Intent to Substantiate Allegations of Child Abuse or Neglect by a Child Care Worker or Licensed Resourced Parent stating that Erika would be listed in the Child

Protection Index if any of the claims were substantiated (R. 208-5 at 2, 209-3).

Erika's hospital employment qualified her as a child care worker (R. 208-5 at 3).

On October 22, 2019, Erika was given a Child Care Worker Assessment Review ("CCWAR") by LOD Crowe where Erika appeared with an attorney and was able to present information she believed that DCS should consider prior to substantiating the allegations (R. 208-5 at 3). On October 25, 2019, the substantiations against Erika were upheld by LOD Crowe and formally approved (R. 208-5 at 3).

At the time of the substantiation, Erika was provided notice of her right to an administrative appeal (R. 208-5 at 3). Erika filed an administrative appeal on November 19, 2022 (R. 208-5 at 3). After Erika raised concerns in April of 2020 that LOD Crowe should not have conducted the first CCWAR, the parties agreed to a second CCWAR and the case was remanded to the local office by an administrative law judge (R. 208-5 at 3-4, 209-11). The second CCWAR was to be heard by Assistant Deputy Director Waylon James (R. 209-12). On June 3, 2020, the Mabes submitted to Assistant Deputy Director James a binder of new evidence including reports from eight medical experts chosen by the Mabes to evaluate the medical records (R. 208-5 at 4). Assistant Deputy Director James directed the local DCS office to reassess the case based on new evidence provided by the Mabes (R. 208-4 at 7, 229-31 at 1-481).

For the reassessment, the Mabes' new evidence was reviewed by FCM McFeeley and LOD Lyman, and they discussed the new information with Dr.

Thompson (R. 208-3 at 7, 208-4 at 7). Additional doctors were also consulted including Dr. Wu, Dr. Supakul, Dr. Marie, and Dr. Brown (R. 208-3 at 8-10). After reviewing the Mabes' new medical evidence, Dr. Thompson amended her opinion to reflect that there was only a single definitive metaphyseal lesion—or corner fracture—on L.M.'s humerus bone (R. 208-3 at 7). Based on a re-review by a Riley radiologist of J.R.M.'s CT scan, Dr. Thompson advised that J.R.M.'s imaging could represent a nutrient vessel rather than a skull fracture, and Dr. Thompson's opinion that J.R.M.'s imaging was "indeterminate" for abuse did not change (R. 208-3 at 7). She also agreed that the poor resuscitation efforts at HRH could have played a role in L.M.'s anoxic brain injury—due to lack of oxygen—but explained that did not account for L.M.'s need for resuscitation (R. 208-4 at 7-8). Dr. Thompson otherwise continued to disagree with and rebut the other opinions offered by the Mabes' medical experts including regarding the age of L.M.'s skull fracture, whether the bone fractures could have come from CPR, and whether the brain tear injury could be from a non-traumatic cause (R. 208-3 at 7-11, 208-4 at 7-8). Dr. Thompson also communicated that L.M.'s x-ray from an emergency room visit six days before the CPR already showed two broken ribs (R. 208-3 at 9-11). The reassessment concluded with the local office again preliminarily substantiating all of the allegations against Erika (R. 208-4 at 8).

In August 2021, Assistant Deputy Director James conducted the second CCWAR hearing and issued a determination on August 10, 2021 (R. 208-5 at 4, 209-12). The Mabes submitted a second binder of evidence prior to that hearing which

included nine additional medical expert evaluations including addendums to the prior evaluations (R. 229-31 at 482-686). Assistant Deputy Director James unsubstantiated the allegations of neglect with regard to J.R.M. and J.A.M., but he substantiated the allegations of neglect with regard to L.M. and the allegation of physical abuse (R. 209-12). Erika then requested an administrative appeal (R. 208-5). During this administrative appeal process, DCS central office decided to unsubstantiate all allegations of abuse and neglect against Erika and the appeal was dismissed (R. 208-5 at 5). FCM Jackie Allemon then formally approved the final assessment decisions based on the non-party's second CCWAR determination and DCS central office's decision (R. 208-6 at 2).

## H.    The Mabes brought the present lawsuit.

On July 19, 2021, the Mabes, by counsel, and on behalf of their minor children, filed a complaint in the district court asserting claims against the DCS Defendants under 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendments (R. 1 at 30-33). Specifically, they alleged 17 legal claims which broadly claim that the initial seizure of the children was improper, that misrepresentations were made in the CHINS petition, and that proper process was not followed in the DCS classification process:

> 250. Defendants seized the children on or about July 20, 2019, without probable cause, without court order, and when the children were in no imminent danger, thereby violating the children's Fourth Amendment right against unreasonable seizure.

> 251. By seizing the children and taking them from the Mabes without probable cause, without a court order, and when they were in no imminent danger, Defendants also violated the Plaintiffs' Fourteenth Amendment substantive due process right to familial relations.

252. By seizing the children without a pre-deprivation hearing or court order when there was no probable cause to believe that the children were in imminent danger due to abuse or neglect and no exigent circumstances existed, Defendants violated the Fourteenth Amendment due process rights of Plaintiffs.

253. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that L.M.'s "history of unsafe sleep" was "a reasonable explanation for his hypoxic brain injury" in the verified petitions and report alleging that the children were CHINS.

254. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that L.M.'s skull fracture was a life-threatening condition in the verified petitions and report alleging that the children were CHINS.

255. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that L.M.'s skull fracture could only have been caused by non-accidental trauma inflicted upon him in the verified petitions and report alleging that the children were CHINS.

256. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that on July 20, 2019 L.M. presented with a "goose egg" or "knot" on his head in the verified petitions and report alleging that the children were CHINS.

257. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that L.M. suffered "life threatening injuries ... that have no plausible explanation" in the verified petitions and report alleging that the children were CHINS.

258. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that L.M.'s abdominal bruise was a sign of physical abuse in the verified petitions and report alleging that the children were CHINS.

259. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that L.M.'s injuries had no plausible explanation in the verified petitions and report alleging that the children were CHINS.

260. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that Brian had admitted to using illegal substances when he was the only adult with

the children in the verified petitions and report alleging that the children were CHINS.

261. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they misrepresented that the surface that L.M. was on when he had his seizure was "extremely soft" in the verified petitions and report alleging that the children were CHINS.

262. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they omitted information about the events that occurred at the HRH emergency room in the verified petitions and report alleging that the children were CHINS.

263. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment when they omitted the fact that a medical examination of J.A.M. showed no signs of abuse or neglect.

264. By failing to follow Indiana law governing the classification of child abuse allegations, Defendants have violated the Plaintiffs' Fourteenth Amendment due process rights.

265. By not classifying the child abuse allegations within a reasonable time, Defendants have violated Plaintiffs' Fourteenth Amendment due process right.

266. Defendants violated the Plaintiffs' due process rights under the Fourteenth Amendment by not unsubstantiating the allegations of abuse against Erika.

(R. 1 at 30-33).

DCS Defendants initially moved to dismiss the case based on issue preclusion, claim preclusion and qualified immunity; that motion was denied (R. 28, 29, 107).

Following discovery, the DCS Defendants moved for summary judgment based on the undisputed evidence establishing (1) the lack of personal involvement by some of the DCS Defendants; (2) the absence of constitutional violations; (3) absolute immunity; (4) qualified immunity; and (5) issue preclusion (R. 207). The Mabes filed a response that disputed some of the facts in the DCS Defendants'

motion including whether Brian admitted to using marijuana when alone with the children, whether the goose egg injury on L.M.'s head was still visible on July 20, 2019, and whether L.M. was lying on a soft surface (R. 231 at 16-17).

On December 22, 2023, the district court issued an order denying the DCS Defendants' motion for summary judgment as well as a motion for summary judgment from Dr. Thompson and a motion for partial summary judgment from the Mabes (App. 1-13). *Mabes v. McFeeley*, 2023 WL 8878427 (S.D. Ind. Dec. 22, 2023). The court denied the DCS Defendants qualified immunity finding "the Mabes had and have a plausible, innocent alternative explanation for the injuries that DCS and Dr. Thompson insisted were abusive—namely, that those were iatrogenic injuries from the local hospital." (App. 7-8). According to the district court, the Mabes would have valid 14th Amendment constitutional claims against the DCS Defendants if a jury credited the Mabes' alternative explanations or found those explanations should have been considered by defendants before acting (App. 7-8). "If a jury were to believe that DCS and Dr. Thompson should have credited, or at least further considered, the Mabes' innocent explanation of events, then their subsequent actions are unconstitutional—an innocent explanation dissolves any reasonable suspicion, removes the emergency, and prevents the administrative prosecution" (App. 8). The district court also denied DCS Defendants qualified immunity for their participation in the administrative review process by observing that "it is a clearly established Fourteenth Amendment violation to afford only 'sham procedures' to challenge the state action" (App. 7). The court also denied the

18

claims of absolute immunity, preclusion, and equitable estoppel (App. 3-6, 8-11). Finally, the court denied the request to dismiss any individual DCS Defendants finding that those who initiated the actions can be responsible for subsequent events and that the DCS Defendants have "not shown that any of its employees may be excused on summary judgment" (App. 13).

## SUMMARY OF THE ARGUMENT

In denying qualified immunity, the district court found that there are jury questions of whether the state officials "should have credited, or at least further considered, the Mabes' innocent explanation of events" before taking action, whether an emergency existed requiring immediate removal, whether that removal improperly continued after probable cause of abuse dissipated, and whether the administrative process was a "sham proceeding." But none of these supposed jury questions overcome qualified immunity without evidence that a reasonable government official in these circumstances would have known the actions violated clearly established rights, and the district court failed to identify what facts could preclude qualified immunity if proven. The district court also defined the federal rights implicated by a state officials' child welfare efforts so broadly that intervention in a family would raise jury questions every time and the protections from lawsuit provided by qualified immunity would be meaningless.

This Court should reverse that rejection of qualified immunity by finding that the undisputed evidence establishes that reasonable suspicion allowed the DCS Defendants to pursue an investigation and that there was probable cause allowing

the emergency removal until a court action could be pursued. But reasonable explanations do not preclude the existence of reasonable suspicion or probable cause. There is no basis for concluding that existing precedent put the lawfulness of the DCS Defendants' conduct "beyond debate" or that the DCS Defendants were "plainly incompetent" or "knowingly violated the law." Even with all the evidence construed in their favor, the Mabes' evidence does not meet those standards.

The Mabes have also failed to identify clearly established rights that were violated by Erika's administrative proceeding. Instead, the undisputed evidence shows that a substantial pre-deprivation and post-deprivation process occurred. Finally, the Mabes have no evidence that some of the DCS Defendants were involved in any of the allegations and admitted as much to the district court. Those uninvolved DCS Defendants certainly should have been granted qualified immunity.

## Standard of Review

The Court reviews a district court's denial of summary judgment on a qualified immunity defense de novo. *Day v. Wooten*, 947 F.3d 453, 460 (7th Cir. 2020). A district court's denial of qualified immunity can be appealed only to the extent that it turns on an issue of law. *Flowers v. Renfro*, 46 F.4th 631, 634 (7th Cir. 2022). The review is "confined to abstract issues of law." *Stewardson v. Biggs*, 43 F.4th 732, 735 (7th Cir. 2022). An appellant must "refrain[] from contesting any fact that a reasonable jury could resolve against him." *Rainsberger v. Benner*, 913 F.3d 640, 643 (7th Cir. 2019) (affirming denial of qualified immunity).

This Court will "first review the district court's decision to see if it identifies factual disputes as the reason for denying qualified immunity." *Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021). "The appellant's argument therefore must accept the facts and reasonable inferences favorable to the plaintiff or the facts assumed by the district court's decision." *Gant v. Hartman*, 924 F.3d 445, 449, (7th Cir. 2019). But this Court may consider "the abstract legal question of whether a given set of undisputed facts demonstrates a violation of clearly established law." *Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013).

## ARGUMENT

### The DCS Defendants did not violate clearly-established law.

The DCS Defendants are entitled to qualified immunity because they did not violate clearly-established law and instead reasonably intervened in the Mabes family for purposes of child welfare. Qualified immunity shields public officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). By ensuring that government officials have fair and clear warning as to which conduct is unlawful, *Anderson v. Creighton*, 483 U.S. 635, 646 (1987), qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013).

To defeat qualified immunity, a plaintiff must establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735. Courts have discretion to grant qualified immunity on the ground that the right allegedly violated was not clearly established at the time of the defendant's conduct, without even deciding whether the plaintiff's constitutional rights were violated. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). And courts should be hesitant to expend judicial resources to resolve constitutional issues that will not impact the outcome of the decision. *al-Kidd*, 563 U.S. at 735.

Qualified immunity is especially important in this sensitive area of child welfare because "child welfare caseworkers are often called upon to make difficult decisions without the benefit of extended deliberation." *Doe v. Heck,* 327 F.3d 492, 525 (7th Cir. 2003). "[T]here is, perhaps, no more worthy object of the public's concern than preventing the most vulnerable members of society, children of tender years, from being physically abused." *Id*. Welfare workers have to walk a tightrope—if they act too soon they risk violating families' constitutional rights, but if they act too late a child might die from neglect. *See Sebesta v. Davis*, 878 F.3d 226, 235 (7th Cir. 2017) (affirming qualified immunity for welfare officials because "[n]othing in these cases would have put [the defendants] on notice that their

suspicions were unreasonable or their actions unlawful."). The DCS Defendants' exercise of that authority should be protected.

## A. The district court failed to properly evaluate any of the DCS Defendants' qualified immunity claims.

The district court improperly denied qualified immunity as a matter of law because it did not conduct the proper analysis. Instead of addressing whether the violations alleged were clearly established rights or whether the individual DCS Defendants violated any clearly established right, the district court here provided only broad conclusions that constitutional violations are clearly established if a child is taken without reasonable suspicion, if a child is removed on an emergency basis "without probable cause or emergency," if state officials "misrepresent facts in a detention hearing," and if only "sham procedures" are afforded (App. 6-7). The district court then denied qualified immunity without even addressing whether the undisputed evidence amounted to reasonable suspicion or probable cause by observing that a jury might credit the Mabes' alternative explanations for the injuries and might believe Defendants should have considered those alternatives before acting, and might find there was no emergency (App. 7-8).

A jury determination that DCS should have believed the Mabes' proposed innocent explanation is not enough to defeat qualified immunity here. Instead, the Mabes have to show that caselaw clearly establishes that no reasonable caseworker could disbelieve the alleged innocent explanation in this circumstance. Indeed, this Court has explained that "what a jury could find" is not the proper test for qualified immunity; instead qualified immunity is a question of law for a court. *Smith v.*

*Finkley*, 10 F.4th 725, 734 (7th Cir. 2021). In *Smith*, this Court gave the district court the benefit of the doubt by concluding "the district court meant that a genuine issue of material fact precluded summary judgment for defendants on the grounds of qualified immunity" and identified two factual disputes that were dispositive to qualified immunity. *Id*. at 738. But here the district court identified no factual disputes, and there are no facts alleged that would have put the DCS Defendants on notice that their actions were unconstitutional (see probable cause discussion, *below*).

The district court further erred by broadly identifying constitutional rights that the DCS Defendants could have violated—through misrepresentations, by failing to consider innocent explanations, and by providing sham proceedings— without addressing whether the specific acts and evidence alleged here could cause a clear violation of federal law (App. 6-8). The Supreme Court has held that clearly established law must not be defined at "a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (2017) (per curiam); *al-Kidd*, 563 U.S. at 742. Instead, the contours of the alleged constitutional right must be "sufficiently clear" at the time of the challenged conduct such "that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640). This means that the analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated in part on other grounds by Pearson*, 555 U.S. at 236. The "dispositive inquiry" is whether it would have been clear to a

reasonable official in the defendant's position that his or her conduct was unlawful. *Wood v. Moss*, 572 U.S. 744, 758 (2014); *Saucier*, 533 U.S. at 202. Put differently, "clearly established law must be 'particularized' to the facts of the case." *White*, 580 U.S. at 79.

In this well-trodden area of probable cause and child protective services, this Court has already provided significant guidance on what actions violate federal law. As discussed below, applying that precedent to the undisputed facts of this case show an entitlement to qualified immunity because nothing that occurred here would put a reasonable government official on notice that she was violating a clearly-established federal right.

## B. DCS Defendants did not violate clearly established law by removing the children from the Mabes home on an emergency basis.

There are no factual disputes that precluded the district court from addressing the probable cause for an emergency removal of the Mabes' children and recognizing that a reasonable government official would not have known that she was violating a clearly-established right. "In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers 'have reason to believe that life or limb is in immediate jeopardy." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000). This Court has found that emergency removal "without a pre-deprivation hearing and court order" requires DCS officials to have "probable cause to believe that the child is in imminent danger of abuse." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463,

486 (7th Cir. 2011).[6] "The danger must be imminent, or put another way, the circumstances must be exigent." *Id.* FCM Supervisor Lyman was navigating a sensitive situation while not arbitrarily abusing her authority when she decided to remove the Mabes children, and thus she—and anyone else liable for that decision—should have been granted qualified immunity for the decision.

The standard for probable cause is neither "a high bar" nor one that is "readily, or even usefully, reduced to a neat set of legal rules." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citations omitted). Courts evaluate probable cause using a totality-of-the-circumstances approach that "recognize[s] that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.* at 60-61. In the present context, the "focus is on the facts and circumstances known to defendants at the time they decided to remove [the child], and whether a prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts." *Hernandez*, 657 F.3d at 475. A DCS official is entitled to qualified immunity "[a]s long as a reasonable DC[]S investigator, supervisor, and manager could have believed [the removal] to be lawful, in light of clearly established law and the information they possessed[.]" *Id.* (cleaned up).

---

[6] The district court cites *Hernandez* to find that only reasonable suspicion is required for an emergency removal of children from their parents (R. 107 at 12-13 n.1; App. 6 at n.2) (citing *Hernandez*, 657 F.3d at 478). But *Hernandez* indicates that probable cause of imminent danger is required for an emergency removal. *See Hernandez*, 657 F.3d at 486. The discussion cited by the district court addresses "continued withholding" of a child and not the initial removal. *Id.* at 478-79.

### i. Probable cause supported the emergency seizure.

Here, the undisputed facts show that reasonable DCS officials would have believed the immediate removal to be lawful. DCS Defendants were responding to a hospital's report of suspected child abuse and neglect that indicated L.M. suffered a skull fracture, was found sleeping "face down on a memory foam mattress," that his father waited 15 minutes before getting help, and that there was unexplained bruising on the child's abdomen (R. 209-1 at 2). The child was reported to be non-responsive, and the condition was reported to be life threatening (R. 209-1 at 2). During the preliminary investigation of this report, DCS was told by Riley Hospital doctors that the abdominal bruising was "highly suspicious" and that there was concern about the parents' explanations for the other injuries (R. 208-2 at 3). Erika was shown the skull fracture and responded by providing "various explanations for the injury including J.A.M. dropping the child, being hit by toys, or falling or running into a corner" (R. 208-2 at 3-4, R. 208-10 at 51). Dr. Thompson advised FCM Davis that L.M.'s injuries did not align with Erika's explanations and that the skull fracture, abdominal bruising, and brain injuries were "highly suspicious for non-accidental injury" (R. 208-2 at 4).

Before removing the children, DCS Defendants further investigated the allegations by questioning the parents with police. During his statement, Brian described putting L.M. to sleep on a "memory foam mattress topper" that he described as "soft for him" and waking up to find the child face down and limp and also described waiting several minutes before getting help (R. 209-15 at 3). DCS

Defendants then accompanied police as they searched the Mabes' home. During the search, officers found oxycodone prescribed to a non-occupant, marijuana, two marijuana smoking devices, and a scale (R. 208-11 at 46-52, 56). Brian admitted that he used Oxycodone and marijuana in the home for his back pain and refused to submit to a drug screening (R. 208-1 at 2).

The Mabes have not identified a single controlling case holding that it is a constitutional violation for state officials to remove children from a home on an emergency basis and pursue a child protection investigation when a hospital reports that one of the siblings has suffered an unexplained traumatic brain injury whose constellation of findings appear characteristic of abusive head trauma and lower abdominal bruising that is highly suspicious for inflicted injury. Although a case directly on point is not required, "existing precedent must have placed the … constitutional question beyond debate." *al-Kidd*, 563 at 741; *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam). In response to the motion for summary judgment, the Mabes did not even challenge the existence of probable cause but instead claimed the real issue is "whether the immediate seizure of the children was necessary to protect their safety" as the children were all "in the custody of someone other than their parents" at the time and "there was no reason to think that Dr. Mabes was at fault" (R. 231 at 15).

But these circumstances of a gravely-injured child, explanations from medical professionals that the injuries were highly suspicious and inconsistent with provided explanations, an admission of unsafe sleep, an admitted delay in seeking

treatment, very young children that cannot speak for themselves, and evidence of drug use in the home all supported a reasonable DCS official's belief that immediate removal of all three children was required based on suspicion that neglect or abuse occurred and was imminent. In *Hernandez*, this Court granted DCS officials qualified immunity for an emergency removal under similar—and even less concerning—circumstances including a fifteen-month-old child with a fractured arm with an older unexplained injury and medical providers that "suspected abuse because [the] injury didn't fit with the parents' statements." *Hernandez*, 657 F.3d at 477. These same type of circumstances were present here as well as the unsafe sleep setting, drug use, and a delay in seeking treatment. The DCS Defendants here reasonably believed that the children "were in imminent danger if they remained in the care of Brian and Erika over the weekend" and noted that the children were too young to ensure their own safety (R. 208-4 at 3).

And even if the children were not with the Mabes at that time, all of the children were still in the legal custody of the Mabes. The physical placement of the children at the hospital and with the grandmother did not alleviate the risk because the parents would have retained the authority to take the children and make decisions for the children, including decisions that may have been aimed at protecting the parents instead of protecting the children's best interests. And even after the emergency removal, L.M. remained in the hospital, J.R.M. remained with the grandmother, and J.A.M. was placed with Erika's sister. As explained in the Preliminary Inquiry, these placements were made based on the recommendations of

Erika and Brian including Erika asking that J.A.M. and J.R.M. be separated to "ease the burden" on Erika's mother (R. 209-13 at 7). A reasonable DCS official could think this emergency decision to remove the children from custody—while allowing two of the children to stay with close family of their choice and allowing continued involvement of the parents with the third child at the hospital—was necessary and lawful.

The Mabes also complain that the DCS Defendants made no attempt to seek a court order before the emergency removal. But the undisputed evidence shows that the Hendricks County juvenile court did not have a mechanism to obtain a court order for removal during non-business hours (R. 228-10 at 6). The emergency here arose during the early morning hours on a Saturday, and the DCS officials removed the children later that day (R. 208-4 at 3). Court approval was then sought shortly after the court opened for business on the immediately following Monday (R. 209-14). Based on the undisputed evidence, the Mabes have simply not shown a basis for concluding that existing precedent placed the alleged unconstitutionality of the emergency seizure "beyond debate." *Stanton*, 571 U.S. at 6.

**ii. DCS Defendants considered the totality of the circumstances and did not ignore innocent explanations.**

In denying qualified immunity, the district court nonetheless found that §1983 liability could still turn on whether the DCS Defendants should "have had second thoughts?" (App. 7). In *Brokaw*, this Court observed that in some cases—but not all—mere allegations of neglect will not support immediate removal and that removal was improper there "without any further investigation into the allegations

of child neglect—not even a home visit, or a conversation with" the child. 235 F.3d at 1011 (citing *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000) ("[T]he police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed.").

But this is not a case where DCS officials failed to investigate the alleged neglect and abuse before acting. Instead, FCMs Davis and Oakes performed a significant investigation before FCM Supervisor Lyman made the initial decision to remove the children including going to the hospital, talking with multiple medical professionals, interviewing both parents, unsuccessfully attempting to interview the only child old enough to talk, and participating in the search of the Mabes' home. While one can always imagine additional steps that could have been taken, the investigation here was significant and the conclusions were based on the admissions by the Mabes, judgment of medical professionals, and findings in the Mabes' home. *See Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 520 (2d Cir. 1996) (finding qualified immunity protected government officials' family-separation decision because they "had a reasonable basis for believing that the circumstances warranted" that separation at the time they effectuated it).

While an investigation may be required, there is no clearly established authority showing that the significant investigation that occurred here was insufficient. Probable cause does not require government officials "to rule out . . . innocent explanation[s] for suspicious facts." *Wesby*, 583 U.S. at 61. And probable

cause was not defeated by the Mabes' various later explanations for the injuries. Instead, "the focus is on the facts and circumstances known to defendants at the time they decided to remove the child." *Hernandez*, 657 F.3d at 477 (cleaned up). Indeed this Court has recognized that qualified immunity is intended to protect child welfare workers who act based on limited information—"Social workers often act on limited information; those who tarry, or resolve all doubts in favor of the parents, chance enduring damage to the children. Immunity helps social workers put their private interests aside and concentrate on the welfare of children." *Millspaugh v. Cnty. Dep't of Pub. Welfare of Wabash Cnty.*, 937 F.2d 1172, 1176 (7th Cir. 1991) (internal citation omitted). The Mabes eventually were able to offer innocent explanations for some—but not all—of the circumstances suggesting abuse or neglect, but possible innocent explanations do not defeat reasonable suspicion or probable cause and the Mabes were able to present those explanations in the subsequent proceedings.[7]

Qualified immunity "provides ample room for mistaken judgments and protects all but the plainly incompetent and those who knowingly violate the law." *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). And in order to defeat qualified immunity, the Mabes were required to show that established precedent showed that no reasonable child welfare worker could have disbelieved the offered innocent explanation in this or a similar circumstance. A possible or even plausible innocent

---

[7] The Mabes' own evidence shows that their binders with contrary medical explanations for the injuries were not provided to the DCS Defendants until June 2020 and August 2021 (R. 228-14 at 1). At that point, the Mabes had already admitted in the CHINS proceeding that the children were subjected to neglect (R. 209-7).

explanation does not defeat reasonable suspicion or probable cause. *Wesby*, 583 U.S. at 61. The Mabes have pointed to no such precedent. Under that standard, this Court should find that qualified immunity protected FCM Supervisor Lyman's well-reasoned initial decision to remove the children and also protected any other DCS Defendants whose liability could be based on that decision.

**C. DCS Defendants are entitled to qualified immunity with regard to the CHINS petition.**

The DCS Defendants also should have been granted qualified immunity on the 11 claims that FCM Davis and FCM Supervisor Lyman made misrepresentations or omissions in the CHINS petitions and accompanying Preliminary Inquiry (R. 1 at 30-32). Due process "at a minimum ... requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents[.]" *Hernandez*, 657 F.3d at 484-85. In *Brokaw*, the Court explained that a government official can be liable if they knowingly provide misinformation or knowingly withhold material information and that the misinformation caused the removal. 235 F.3d at 1012 ("[W]e note that to the extent the defendants knew the allegations of child neglect were false, or withheld material information, and nonetheless caused, or conspired to cause, [the child's] removal from his home, they violated the Fourth Amendment.). That is the same standard applicable in the analogous area of police liability under Section 1983 for false statements in probable cause affidavits. *See Taylor v. Hughes*, 26 F.4th 419, 426-27 (7th Cir. 2022).

In denying this claim, the district court found it "is a clearly established Fourteenth Amendment violation to misrepresent facts in a detention hearing" (App. 7) (citing *Hernandez*, 657 F.3d at 486). But the district court entirely failed to consider whether the Mabes actually presented evidence of misrepresentations or omissions that could support such a constitutional claim. In *Taylor*, this Court explained that requirement: "To earn a trial on such a claim, a § 1983 plaintiff must bring forth enough evidence to permit a reasonable jury to conclude that the defendant officer made intentional or reckless misrepresentations of fact that were necessary to the finding of probable cause." 26 F.4th at 426-27. The Mabes have not presented evidence to show that a material misrepresentation or omission actually occurred or even to show that there is a dispute of material fact regarding whether a material misrepresentation or omission occurred, so qualified immunity should shield the DCS Defendants' presentation of evidence to the state court.

### i. DCS Defendants are entitled to qualified immunity because none of the alleged misrepresentations or omissions were necessary to a finding of probable cause.

Here, while the Mabes' allege that specific statements in the Preliminary Inquiry misstated or overstated the facts, the Mabes entirely failed to put forth evidence in response to the DCS Defendant's motion for summary judgment by actually showing that the DCS Defendants made misrepresentations or material omissions that were necessary for the probable cause determination. "The materiality of an omitted or misrepresented fact depends on its relative importance to the evaluation of probable cause." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir.

2010). For a claim that a misrepresentation was material, this Court looks to whether probable cause exists after "eliminating any false statements." *United States v. Mullins*, 803 F.3d 858, 862 (7th Cir. 2015). For a claim that an omission was material, this Court examines "whether a hypothetical affidavit that included the omitted material would still establish probable cause." *Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016). Under that controlling standard, none of the claimed omissions or misstatements are material.

To seek a court's intervention with an allegation of neglect or abuse, DCS "caseworkers must have some definite and articulable evidence giving rise to a reasonable suspicion of past or imminent danger of abuse … ." *Hernandez*, 657 F.3d at 478. Indiana law requires probable cause that a child is a CHINS before allowing the filing of a CHINS petition or authorizing the continued removal of a child. Ind. Code §§ 31-34-5-3(a), 31-34-9-2(2).

The DCS Defendants explained the probable cause for removal above, (*see supra*, §(B)(i)), without relying on any of the alleged misrepresentations or disputed facts (R. 1 at 30-32). Even after excising the disputed facts, there is still ample probable cause of abuse or neglect based on a gravely-ill child, explanations from medical professionals that the injuries were highly suspicious and inconsistent with provided explanations, an admission of unsafe sleep, an admitted delay in seeking treatment, and evidence of drug use. To the extent some of the same substantive facts are included—*e.g.* unsafe sleep, the seriousness of the injuries, drug use, and the lack of plausible explanations—those substantive facts are presented above with

the explanations and qualifications that remove the claimed misrepresentations while still construing all of the evidence most favorably to the Mabes.

Similarly, the allegedly omitted information would not have defeated that probable cause. The Mabes complain that DCS Defendants should have included information about the events at HRH (R. 1 at 32), but the Preliminary Inquiry already included most of the then-known details from HRH including Erika describing L.M. being intubated and as having "coded"—a common term for a respiratory or cardiac event (R. 209-13 at 3, 4; 209-15 at 25). Erika did further clarify about what occurred at HRH in her statement on July 20, 2019, by stating that L.M. had "crashed" and "coded" while at the first hospital and that L.M.'s "O2 stats went down, his heart rate went down" (R. 209-15 at 25). But DCS Defendants had no information that those details could have fully accounted for L.M.'s condition and had other information that L.M.'s loss of oxygen could have been due to breathing problems from the unsafe sleeping incident. Erika also did not mention the violent nature of the CPR that she observed at HRH until a week after the removal and court proceedings were initiated (R. 209-15 at 25, 228-6 at 57-58). Moreover, nothing suggests the actual records from HRH were available to be included in the CHINS filing. Those records were requested on the first business day after the event—the same day as the CHINS filing—and not received until three days later (R. 208-2 at 5-6, 208-3 at 1, 5, 209-14). DCS Defendants could not have intentionally omitted information that they did not yet have.

The Mabes further complain that DCS Defendants should have included information about three-year-old J.A.M.'s examination (R. 1 at 33). However, the Preliminary Inquiry specifically states that Dr. Thompson ordered "a head to toe exam" for J.A.M. and that his parents were told he "needed to be brought in to see a doctor" (R. 209-13 at 5). The report also noted that FCM Oakes observed J.A.M. "had no bruises or marks anywhere on his body" (R. 209-13 at 5). This issue was also addressed at the initial CHINS hearing (R. 209-5 at 20). FCM Davis testified that J.A.M.'s examination had not yet occurred, but then acknowledged that no abnormalities were found (R. 209-5 at 20). Other records show that J.A.M. did not receive his full exam until July 23, 2019, a day after the CHINS filings, and DCS did not receive the records from that exam until August 1, 2019 (R. 209-3 at 11). Based on the undisputed evidence, the Mabes have not shown that any significant omission of available evidence occurred, much less an intentional omission that would have defeated probable cause.

The DCS Defendants should have been granted qualified immunity for all 11 of the claims alleging misrepresentations and omission in the CHINS filings because the Mabes failed to present evidence that those facts were necessary for probable cause. The Mabes have not "earn[ed] a trial" by showing relevant evidence to defeat qualified immunity. *Taylor*, 26 F.4th at 426–27.

**ii. The Mabes have presented no evidence showing intentional misrepresentation.**

Moreover, even when construing all of the evidence in their favor, the Mabes presented no evidence even suggesting that any of the nine alleged

37

misrepresentations were "intentional or reckless misrepresentations" made by a DCS official aimed at misleading the juvenile court. Instead, seven of the claimed misrepresentations merely summarize evidence that is explained elsewhere in the Preliminary Inquiry. While the Mabes can quibble about the accuracy of those summaries, the documents as a whole explained the basis for each assertion:

### 1. A "history of unsafe sleep" was "a reasonable explanation for his hypoxic brain injury" [R. 1 ¶253].

This factual assertion in the Preliminary Inquiry merely repeated, with attribution, the assessment of the Dr. Thompson (R. 209-13 at 8, 12). Dr. Thompson is appropriately identified in the Preliminary Inquiry as a "Child Abuse Protection (CPT) PEDS doctor" (R. 209-13 at 4). In her report that is copied into the Preliminary Inquiry, Dr. Thompson specifically stated that the "[h]istory of unsafe sleep (found face down on memory foam mattress with crib cover) could be a reasonable explanation for his hypoxic brain injury" (R. 209-2 at 9). This medical impression is not attributable to DCS Defendants; thus, DCS Defendants cannot be held liable.

The Mabes also have not shown any reason that the DCS Defendants should have questioned Dr. Thompson's opinion at that time. A government official can "reasonably defer[]to a medical professionals' opinions." *Johnson v. Doughty*, 433 F.3d 1001, 1010–11 (7th Cir. 2006) (citing *Bond v. Aguinaldo*, 228 F.Supp.2d 918, 920 (N.D. Ill. 2002) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.")).

## 2. L.M.'s skull fracture was a life-threatening condition [R. 1 ¶254].

This appears to be a reference to the list of justifications for a continued out-of-home placement in the Preliminary Inquiry including that L.M. "was brought to Riley Hospital with life threatening injuries that included bruising on his abdomen, a skull fracture, severe brain damage, and a knot on his head" (209-13 at 16). The undisputed evidence shows a good-faith basis for this statement as Dr. Thompson's report stated that L.M. was in "critical condition with status epileptic [prolonged seizures] with grave prognosis" (R. 209-2 at 8). Her initial report was included in the Preliminary Inquiry and describes all of the injuries including both the hypoxic encephalopathy and a "complex" skull fracture (R. 209-2 at 8). The report did not explain which of the constellation of injuries were the life-threatening conditions. Additionally, the Preliminary Inquiry described FCM Davis talking with Dr. Ackerman who described L.M. as suffering a "severe abnormal brain injury that did not match a low oxygen injury" and that L.M. was "neurologically devastated" (R. 208-2 at 3). Both of these reports from Riley Doctors supported the challenged description of the injury. Again, to the extent this medical impression is not attributable to DCS Defendants, DCS Defendants cannot be held liable.

The Preliminary Inquiry also included an extensive recounting of all of the medical evidence available at that time (R. 209-13 at 2-7). So to any extent that this factual assertion overstated the import of the skull fracture instead of simply including it as part of the constellation of injuries, the CHINS filings as a whole were still not misleading, much less intentionally misleading.

### 3. L.M.'s skull fracture could only have been caused by non-accidental trauma inflicted upon him [R. 1 ¶255].

Neither the CHINS Petition nor the Preliminary Inquiry claim that skull fracture could only have been caused by non-accidental injury. The closest the Preliminary Inquiry comes to such a statement is asserting as a reason for continued removal that L.M. is "in critical condition with non accidental injuries" (R. 209-13 at 48). The Preliminary Inquiry also recounted all of the available medical evidence supporting the suspicion of non-accidental injury including that that Dr. Thompson had found the cause "Indeterminate, highly suspicious for non-accident injury" (R-209-13 at 39). It also quoted Dr. Thompson's written finding that the explanations provided by the Mabes of accidental injuries would all "be highly unlikely to have resulted in the fracture" and that she has "grave concern/high suspicion for child maltreatment" (R-209-13 at 40). While the final recommendation could have been more precise, the Preliminary Inquiry as a whole was not misleading and does not suggest an intent to mislead.

### 4. L.M. suffered "life threatening injuries ... that have no plausible explanation" [R. 1 ¶ 257].

This claim appears to be crafted by combining two assertions from the Preliminary Inquiry. First, that L.M. presented "with life threatening injuries that included bruising on his abdomen, a skull fracture, severe brain damage, and a knot on his head;" and second, that "none of [the Mabes' provided] explanations would be plausible for the infant's skull fracture and bruising" (R. 209-13 at 16). In context of the entire Preliminary Inquiry report, it is clear those statements were referring to

the constellation of injuries as being life threatening and describing the skull fracture and bruising as being unsupported by the explanations provided. Those assertions are supported by the evidence provided to DCS by the medical personnel.

### 5. L.M.'s abdominal bruise was a sign of physical abuse [R. 1 ¶ 258].

Dr. Thompson's report that is included in the Preliminary Inquiry specifically stated that bruising on soft tissue areas including the abdomen is "suspicious for inflicted injury" and that "ANY bruising in premobile infants like [L.M.] is also highly suspicious for inflicted injury" and is known occur in less than one percent of healthy infants under six months of age (R. 209-2 at 9-10).

### 6. L.M.'s injuries had no plausible explanation [R. 1 ¶ 259].

The DCS Preliminary Inquiry stated it was recommending continued removal because "none of [the Mabes' provided] explanations would be plausible for the infant's skull fracture and bruising" (R. 209-13 at 16). This was supported by the medical history provided in that same document including Dr. Thompson describing as "gravely troubling ... [L.M.'s] poorly explained complex skull fracture, and poorly explained abdominal bruising" (R. 209-13 at 8). Dr. Thompson explained that the histories provided were "highly unlikely to have resulted in the fracture seen" and there was no medical support for a claim that "easy bruising" may have caused the abdominal marks (R. 209-13 at 8). By including the doctor's report in the Preliminary Inquiry, the DCS Defendants allowed the trial court to make its decision based on the medical evidence instead of any summary or simplification by a lay person.

### 7. The surface that L.M. was on when he had his seizure was "extremely soft" [R. 1 ¶261].

This characterization of the sleeping surface was explicitly based on FCM Oakes' personal observation from the search of the residence that "the memory foam mattress … was extremely soft and would form to your hand when pushed on it" (R. 209-13 at 5). The description is also supported by significant undisputed evidence. First, in his recorded statement, Brian described it as a "memory foam mattress topper" that was "kind of soft" and described it as a "queen size" mattress pad "that was doubled over" (209-15 at 3, 12). Brian's description was included in the Preliminary Inquiry (R. 209-13 at 3). Second, the Preliminary Inquiry also included Dr. Thompson's understanding that it was a "memory foam mattress with crib cover" (209-15 at 8). Third, the preserved pictures of the mattress support FCM Oakes' report and show a harder layer that covered only a portion of the mattress (R. 208-1 at 2, 4-5). While there may be a question of fact regarding whether L.M. was placed directly on the soft mattress or instead on the harder crib cover that was on top of part of the mattress, the nature of that mattress was accurately described based on the then-available facts.

\*      \*      \*

Additionally, the Mabes allege two other misrepresentations that relate to disputed facts—whether Brian admitted to using drugs while alone with the children and whether the prior "knot" injury was still visible on July 20, 2019. Even with these two allegations, there is no evidence suggesting an intentional effort to

mislead the CHINS court. Instead, the undisputed evidence shows the DCS Defendants had a good-faith basis for each of the challenged assertions:

### 1. L.M. presented with a "goose egg" or "knot" on his head [R. 1 ¶256].

DCS did assert in the Preliminary Inquiry as a basis for continued detention that L.M. "was brought to Riley Hospital with … a knot on his head" (209-13 at 16). While there is a contested question of fact regarding whether the knot was still visible, this assertion was nonetheless supported by undisputed evidence including that Detective Tyree reported seeing the knot and that the history of the knot was discussed with Brian and Erika (R. 209-13 at 2-4, 8-9, 18). In Brian's recorded statement, Detective Tyree specifically observed that "you can still kind of see … [that L.M.] has a goose egg on the side of his head." and Brian responded "Yeah, he had a [demonstrating]" (R. 209-15 at 9). Erika also discussed the injury in her statement and claimed it occurred "a couple weeks ago" (R. 209-15 at 36). Even though a factual question remains regarding whether the injury was still visible, there is no question that it had occurred, was claimed to be seen by non-party Detective Tyree, and was admitted by the Mabes. The main import of the goose egg had nothing to do with the visibility on July 20, 2019, and instead was included as a prior "impact [that] has occurred [to] this neonate and no medical care had ever reportedly been sought" (R. 209-13 at 8). These circumstances do not suggest an intentional misrepresentation.

## 2. Brian admitted to using illegal substances when he was the only adult with the children [R 1 ¶260].

The DCS Defendants recognize that there is also factual dispute regarding whether Brian disclosed using marijuana while alone with the children. The statement was included in the Preliminary Inquiry (R. 209-13 at 9), but it was later denied by Brian (R. 228-4 at 73). But even excluding that statement, there was similar evidence known at that time that Brian kept marijuana and narcotics prescribed to another person in the home as well as drug paraphernalia, used drugs in the home, and refused a drug test (R. 208-1 at 2, 208-11 at 46-52, 56). And even if this was an intentional misrepresentation by FCM Oakes, there is no evidence that FCM Davis and FCM Supervisor Lyman knew it was false when they included it in the Preliminary Inquiry and no reason to conclude the disavowed statement was necessary to the finding of probable cause.

* * *

Even if minor misstatements or inconstancies were included in the CHINS filings, it would not have been obvious to a state official that the filings as a whole were clearly unconstitutional when substantial facts established probable cause. Moreover, the CHINS filings were prepared within the first 24-48 hours of the investigation. Such preliminary information is surely different than what will be known over time. Plaintiffs have not shown that DCS Defendants' detailed statements to the CHINS court—which included information from various sources including medical professionals and law enforcement—were intended to mislead the court, did mislead the court, or otherwise violated clearly established law.

**D. DCS Defendants are entitled to qualified immunity for their participation in the administrative review.**

The district court also erred by denying DCS Defendants qualified immunity for their participation in the administrative review process. As explained above, this claim was denied without identifying factual questions and by broadly defining a right. In the Complaint, the Mabes seek relief for the administrative review process "failing to follow Indiana law," failing to complete that administrative review "within a reasonable time," and "by not unsubstantiating the allegations of abuse against Erika" (R. 1 at 32-33). The district court quickly dispatched the qualified immunity claim by observing that "it is a clearly established Fourteenth Amendment violation to afford only 'sham procedures' to challenge the state action" of substantiating allegations of child abuse and neglect (App. 7) (*citing Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 503 (7th Cir. 1999). The district court appears to believe that all claims of sham due process survive summary judgment.

The district court should have instead granted qualified immunity on these claims because Erika received an adequate pre-deprivation and post-deprivation proceeding under the clearly established law. The Mabes have entirely failed to show that "the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017). "The hallmark of due process is an opportunity to be heard at a meaningful time and in a meaningful manner." *Dupuy v. Samuels*, 397 F.3d 493, 507 (7th Cir. 2005). Child abuse investigators must "take into account all of the available evidence that tends to show that abuse or neglect did or did not occur.

45

Only then may the investigator decide whether that totality of evidence would cause a reasonable individual to believe that a child was abused or neglected." *Id.* at 506. To the extent the Mabes are claiming the administrative review process violated Indiana law, "[t]he Supreme Court has made clear the requirement of due process is not defined by state rules and regulations, but is an independent determination." *Boyd v. Owen*, 481 F.3d 520, 524 (7th Cir. 2007) (citing *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

Here, a reasonable government official would believe that Erika was provided with all clearly-established due process that she was entitled to. DCS Defendants provided Erika, a child-care worker, with a constitutionally adequate pre-deprivation review process including a hearing with counsel, a hearing officer who was not involved in the prior decision, the right to present evidence, and a right to a judicial review of that deprivation (R. 208-4 at 7-8, 208-5 at 3-5). Specifically, Erika received a pre-deprivation CCWAR by LOD Crowe where Erika appeared with an attorney and was able to present information she believed that DCS should consider prior to substantiating the allegations (R. 208-5 at 3). She was also allowed an appeal and further process when she raised complaints about the process including a second CCWAR (R. 208-4 at 7-8, 208-5 at 3-5). No clearly established law shows that this was insufficient.

The Mabes claim the process was inadequate because the DCS Defendants were focused on substantiating the allegations instead of considering all of the evidence and did not conduct a sufficient investigation (R. 231 at 17-18). But that

claim is not supported by the undisputed evidence. The record instead shows significant efforts by FCM McFeeley and LOD Lyman to investigate including consultation with experts and identifying which of the Mabes' alternative explanations were plausible (R. 208-3 at 7-11, 208-4 at 7-8). This Court's precedent "merely requires [DCS] workers to consider exculpatory evidence – not to treat it as dispositive." *Sebesta v. Davis*, 878 F.3d 226, 235 (7th Cir. 2017). While the DCS Defendants could have conceivably done even more here or in any case, there is no clearly established law that required more than the extensive investigation that did occur. And at the time of most of the administrative process, Brian and Erika had already entered into the agreed judgment in the state court admitting that L.M. was seriously injured and that Brian had neglected all three Mabes children (R. 209-7).

The Mabes further claim Erika was denied a clearly established right to a pre-deprivation review by someone who had not taken part in the investigation of the Mabes' conduct (R. 231 at 20-21). They claim this right was violated because the initial reviewer, LOD Crowe, was peripherally involved as the local office director including having conversations with other DCS employees about the case and providing advice (R. 231 at 20-21). But the Mabes have not shown any clearly established right to have an entirely-uninvolved hearing officer. In the area of public welfare, the Supreme Court found an "impartial decision maker is essential" to a deprivation review but "that prior involvement in some aspects of a case will not necessarily bar a welfare official from acting as a decision maker." *Goldberg v.*

*Kelly*, 397 U.S. 254, 271 (1970). Similarly, this Court has found in the area of prison disciplinary review that due process requires "disqualification of a decision maker who is directly or substantially involved in the incident …, but it does not require disqualification of a decision maker who is only 'tangentially involved.'" *Gaither v. Anderson*, 236 F.3d 817, 820 (7th Cir. 2000).

LOD Crowe was a proper decision maker because her prior involvement was very limited. Prior to conducting the first CCWAR, she was only kept up-to-date on the case, had conversations about the case, and provided some guidance or suggestions (R. 231 at 21-22). There is no evidence that she took part in any investigation or made any prior decision regarding the investigation. Based on Crowe's limited involvement, there is no precedent clearly establishing that a right to an impartial hearing officer was violated. And any concern was further addressed by providing Erika with the second CCWAR (R. 208-5 at 3-4, 209-11). The entire administrative review process worked in the way it is designed to and to Erika's benefit including the administrative law judge agreeing to remand to ensure it was done right. This even provided Erika with the opportunity to present additional evidence (R. 208-5 at 4). The district court should have looked at the significant due process that Erika was afforded and found the DCS Defendants were entitled to qualified immunity because no clearly established rights were violated.

## E. DCS Defendants are entitled to qualified immunity where there is no evidence of personal involvement.

Finally, the district court erred by denying qualified immunity to the individual DCS Defendants who were not involved in the alleged deprivations.

48

"Qualified immunity is an individual defense available to each individual defendant in his individual capacity." *Estate of Williams by Rose v. Cline*, 902 F.3d 643, 651 (7th Cir. 2018). This Court's precedents "demonstrate a painstaking commitment to an individualized qualified-immunity analysis, especially when the facts relative to the alleged constitutional violation differ from defendant to defendant." *Id.*

The district court denied summary judgment based on individual liability finding that "participants in the initial stages" can be "responsible for the later" constitutional deprivations (App. 13). But that logic would at most apply to Defendants Lyman, Oakes, and Davis. All of the other Defendants should be protected from the initial stage claims due the absence of any individual involvement.

The district court completely failed to consider whether the other individual defendants were implicated in the allegations. In their response to summary judgment, the Mabes even conceded that Defendants Miller and King "were not personally involved" in any of the alleged constitutional violations (R. 231 at 27). At minimum, Defendants Miller and King are entitled to summary judgment. The Mabes only claim that Defendants Lyman, McFeeley, Crowe, Allemon, and Oakes were involved in the later administrative process of investigating and substantiating the allegations (R. 231 at 27-28). So Defendants Miller, King, and Crowe are not proper parties for those claims.

## CONCLUSION

For the foregoing reasons, the district court's order denying summary

judgment to the DCS Defendants based on qualified immunity should be reversed.

Respectfully submitted,

/s/ Justin F. Roebel
Justin F. Roebel
Deputy Attorney General

Office of Indiana Attorney General
Indiana Government Center South,
   Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-7635
Fax: (317) 232-7979

Counsel for Appellants
*Angela McFeeley, Natasha Davis,*
*Courtney Oakes, Samantha King,*
*Hannah Lyman, Kristin Miller,*
*Courtney Crowe, and Jaclyn Allemon*

**FED. R. APP. P. 32(g) WORD COUNT CERTIFICATE**

1.　　Pursuant to Fed. R. App. P. 32(g), the undersigned counsel for the Appellants certifies that this brief complies with the type-volume limitations of Circuit Rule 32(c) because the brief contains 13,536 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.　　This brief has been prepared in a proportionally spaced typeface using Microsoft Word in font size 12, Century Schoolbook typeface for the text and font size 11, Century Schoolbook typeface for the text the footnotes. See Cir. R. 32(b).

/s/ Justin F. Roebel
Justin F. Roebel
Deputy Attorney General

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(D)

Pursuant to Circuit Rule 30(d), I certify that all materials required by Circuit Rule 30(a) and 30(b) are in the appendix bound with this brief.

<u>/s/ Justin F. Roebel</u>
Justin F. Roebel
Deputy Attorney General

# In the
# United States Court of Appeals
## for the Seventh Circuit

ERIKA MABES, ET AL.,
*Plaintiffs-Appellees,*

*v.*

SHANNON THOMPSON, ET AL.,
*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
No. 1:21-cv-02062-JRS-MKK
The Honorable James R. Sweeney, Judge

**JOINT REQUIRED SHORT APPENDIX FOR ALL DEFENDANTS-APPELLANTS**

Stephanie L. Gutwein
Ryan M. Hurley
Liam Williams
Addison Kane Zielinski
300 North Meridian Street, Ste. 2500
Indianapolis, IN 46204
Telephone: 317-237-0300
Fax: 317-237-1000
stephanie.gutwein@faegredrinker.com
ryan.hurley@faegredrinker.com
liam.williams@faegredrinker.com
addison.zielinski@faegredrinker.com

*Attorneys for Defendant-Appellant*
*Shannon Thompson, M.D.*

Theodore E. Rokita
Indiana Attorney General

Justin F. Roebel
Deputy Attorney General

OFFICE OF INDIANA ATTORNEY GENERAL
Indiana Government Center South
    Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-7635
Fax: (317) 232-7979

*Counsel for Appellants*
*Angela McFeeley, Natasha Davis, Courtney*
*Oakes, Samantha King, Hannah Lyman,*
*Kristin Miller, Courtney Crowe, and Jaclyn*
*Allemon*

# Table of Contents

**Page**

Order on Motions for Summary Judgment ................................................ 1

Order on Motions to Dismiss ................................................................ 15

Certificate of Compliance with Circuit Rule 30(d) ............................... 50

Certificate of Service ......................................................................... 52

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ERIKA MABES individually and on behalf of L.M., J.R.M., and J.A.M., minor children, BRIAN MABES individually and on behalf of L.M., J.R.M., and J.A.M., minor children, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    No. 1:21-cv-02062-JRS-MKK |
| | ) |
| ANGELA MCFEELEY, NATASHA DAVIS, COURTNEY OAKES, SAMANTHA KING, HANNAH LYMAN, KRISTIN MILLER, COURTNEY CROWE, JACLYN ALLEMON, SHANNON THOMPSON M.D., | ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

**Order on Motions for Summary Judgment**

## I.    Introduction

This is a civil rights case about a child abuse investigation.  After Erika and Brian Mabes brought their infant son L.M. to a hospital, the Indiana Department of Child Services ("DCS"), suspecting abuse in part because of Dr. Thompson's medical advice, seized custody of all three Mabes children and began an administrative prosecution of the Mabes parents.  The Mabes claim DCS and its medical advisor violated their constitutional rights both in the initial seizure of the children and in the subsequent prosecution.  The Court previously denied motions to dismiss from the DCS employee defendants, (ECF No. 28), and Dr. Thompson, (ECF No. 31), but granted a motion to

dismiss from one of Dr. Thompson's employers, IU Health, (ECF No. 26).  Now before the Court are DCS' and Dr. Thompson's Motions for Summary Judgment, (ECF Nos. 207, 213) and the Mabes' Motion for Partial Summary Judgment, (ECF No. 188).

## II.    Legal Standard

The legal standard on summary judgment is well established:

> Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba* [*v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018)] (quoting *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 [] (1986)). A theory "too divorced from the factual record" does not create a genuine issue of material fact. *Id.* at 721. "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020).

*Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021).  The Court applies that standard here.

## III.    Discussion

This is a complex case, on both the law and the emerging facts.  The issues presented on these motions for summary judgment are best analyzed according to three guiding questions: (1) do preclusion doctrines forestall this case from reaching the merits? (2) if the merits are reached, do any of the alleged constitutional violations defeat immunity defenses? and (3) if claims survive, who could properly be held responsible?

A.  Preclusion

DCS' administrative prosecution threw up various judicial and quasi-judicial orders that might trigger preclusion doctrines.  Two days after DCS took custody of the Mabes children in July 2019 on a purported emergency, there was a state court hearing.  That hearing resulted in an Order on Initial & Detention Hearing, (ECF No. 209-6), in which the state court approved the emergency seizure of the Mabes children and authorized their continued detention.  Over the next few months, DCS pursued its investigation, which culminated in October 2019 with an "Assessment of Alleged Child Abuse or Neglect," (ECF No. 209-3): a list of allegations[1] against the Mabes parents.  The same month, the Mabes stipulated to an Agreed Entry, (ECF No. 209-7), in which, without resolving the "substantiations," they agreed to a fact finding that their children were "Children in Need of Services" ("CHINS") under Indiana law.  That Entry was ratified by the state court.  (ECF No. 209-8).  The substance of the allegations in the "Assessment" were not heard in the state court, then or at any other time.  But the Agreed Entry preserved Erika Mabes' right to an administrative appeal, which she took, and in which she eventually prevailed, as far as the administrative apparatus allows: the "substantiations" against her were recategorized as "unsubstantiated."  (ECF No. 229-16.)

Dr. Thompson argues that the Mabes admitted in the Agreed Entry that the State was justified in seizing their children, so, by issue preclusion or judicial estoppel, they

---

[1] DCS, heedless of the usual distinction between unproven allegations and proven convictions, chooses to call its allegations "substantiations," despite the obvious potential for confusion and abuse.

SA 003

should not be able to make constitutional claims here.  DCS joins those arguments and points as well to the Order on Initial & Detention Hearing.  (ECF No. 209-6.)

The Court uses Indiana preclusion law to decide the question of issue preclusion. *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 562 (7th Cir. 2019) (citing 28 U.S.C. § 1738; *Adams v. Adams*, 738 F.3d 861, 865 (7th Cir. 2013)).   In Indiana, issue preclusion applies to "final" decisions where "the party in the prior action had a full and fair opportunity to litigate the issue" and it is fair "to apply [the doctrine] given the facts of the particular case." *Taylor v. City of Lawrenceburg*, 909 F.3d 177, 181 (7th Cir. 2018) (quoting *Indianapolis Downs, LLC v. Herr*, 834 N.E.2d 699, 705 (Ind. Ct. App. 2005)).  The burden is on Dr. Thompson and DCS to show preclusion is appropriate.  *State v. Barnett*, 176 N.E.3d 542, 553 (Ind. Ct. App. 2021), *trans. denied*, 180 N.E.3d 933 (Ind. 2022).

There are two reasons issue preclusion is inappropriate here.

First, neither Dr. Thompson nor DCS has shown the Order on Initial Hearing or the Agreed Entry are "final."  The Agreed Entry preserves the right to appeal; Erika Mabes took an appeal; eventually she prevailed, and DCS "unsubstantiated" the accusations against her.  (Crowe Decl. 5, ECF No. 208-5.)  DCS once asserted that the outcome of that appeal is irrelevant to the former proceedings.  (Br. Supp. M. Dismiss 4–5, ECF No. 29).  But how can that be?  The "substantiations" are the grounds for taking custody of children or declaring them CHINS; if a later administrative appeal overturns some or all of the "substantiations," then the earlier orders cannot stand

4

as issued, even if there was no direct amendment or further proceeding in the state court proper.

Second, and more fundamentally, Dr. Thompson and DCS have not shown the Mabes had a "full and fair" opportunity to litigate the issues in the state court and administrative proceedings. For the Mabes to have had a "full and fair" opportunity to litigate there, the proceeding must have comported with constitutional due process. *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 481 (1982) (explaining only "state proceedings [that] satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause" are entitled to preclusive effect in federal court); *Jones v. City of Alton, Ill.*, 757 F.2d 878, 884 (7th Cir. 1985) (same). But a violation of constitutional due process is just what the Mabes allege here. So, Dr. Thompson and DCS cannot prevail on issue preclusion without prevailing on the merits—and, as will be seen, it is too soon to say whether they will. (The rule is generalizable: the defendant in a due process case will never be able to use the challenged proceeding to preclusive effect without first winning the substantive case—and at that point, of course, preclusion is gratuitous.) The Indiana Supreme Court is aware of the interplay here: while CHINS proceedings can have preclusive effect, *Matter of Eq.W.*, 124 N.E.3d 1201, 1211 (Ind. 2019), the effect is not "without limits," *id.* at 1212. The Court explains that because the ostensible purpose of DCS intervention " is to protect children, not punish parents," parents are supposed to receive "significant procedural safeguards," without which violations of due process "are of paramount concern." *Id.*

5

at 1209.  In that Court's judgment, CHINS proceedings are "ripe for potential abuse by the State." *Id.* at 1211.

Judicial estoppel is not appropriate here, either.  That equitable doctrine prevents litigants from prevailing on inconsistent positions at different stages in a case.  *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001); *Meridian Ins. Co. v. Zepeda*, 734 N.E.2d 1126, 1133 (Ind. Ct. App. 2000).  The Mabes did not prevail on inconsistent positions in state court: the state court never found in their favor on either detention or the CHINS finding.  The only proceeding in which they could be said to prevail— the "unsubstantiation" of the accusations against Erika—was litigated on the exact theory advanced here: that the DCS charges were groundless and based on what medical diagnosticians call "premature closure" and "anchoring errors."  Brian F. Mandell, "Cognitive Errors in Clinical Decision Making," Merck Manual, https://www.merckmanuals.com/professional/special-subjects/clinical-decision-making/cognitive-errors-in-clinical-decision-making.   The Court sees no "risk of inconsistent court determinations." *New Hampshire*, 532 U.S. at 751.

### B.  Merits

This Court has already discussed the alleged constitutional violations.  (Order 11– 16, ECF No. 107.)  In short, it is a clearly established Fourteenth Amendment violation to take children into custody without a reasonable suspicion[2] of abuse, *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011); it is a clearly established Fourth Amendment violation to take children without probable cause or

---

[2] For a discussion of the Seventh Circuit's path to the holding that the state's seizure of children requires only a reasonable suspicion, *see* Order 13 n.1, ECF No. 107.

SA 006

emergency, *Siliven v. Indiana Dep't of Child Servs.*, 635 F.3d 921, 926 (7th Cir. 2011) (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000)); and it is a clearly established Fourteenth Amendment violation to misrepresent facts in a detention hearing or to afford only "sham procedures" to challenge the state action, *Hernandez*, 657 F.3d at 486 (quoting *Brokaw*, 235 F.3d at 1020) (unconstitutional to misrepresent facts), *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 503 (7th Cir.1999) ("[S]ham procedures do not satisfy due process.").

The Mabes' injured child was lifelined to Riley Hospital after an allegedly disastrous failed treatment attempt at a local hospital. (Erika Mabes Decl. 11–12, ECF No. 229-1.) The doctors at Riley saw a gravely injured infant and brought in Dr. Thompson to consult. (Thompson Decl. 2, ECF No. 217.) From there, DCS and Dr. Thompson claim they made a reasonable diagnosis of abuse, made a reasonable decision to take emergency custody of the children, and followed reasonable procedures in the subsequent investigation and administrative proceeding. Maybe so. But here is the crux: the Mabes had and have a plausible, innocent alternative explanation for the injuries that DCS and Dr. Thompson insisted were abusive— namely, that those were iatrogenic injuries from the local hospital. (Erika Mabes Decl. 12, ECF No. 229-1 (averring she told the treating doctors, including Dr. Thompson, of the iatrogenic injuries on the night of the emergency).) Thus the legal effect of all DCS' and Dr. Thompson's actions—from the night of the emergency to the end of the administrative appeals—could turn on a single disputed factual question of credibility: ought DCS and Dr. Thompson to have had second thoughts? *Stinson v.*

*Gauger*, 868 F.3d 516, 526 (7th Cir. 2017) ("[W]hether their opinions were intentionally fabricated or honestly mistaken is a question of fact, not a question of law."). If a jury were to believe that DCS and Dr. Thompson should have credited, or at least further considered, the Mabes' innocent explanation of events, then their subsequent actions are unconstitutional—an innocent explanation dissolves any reasonable suspicion, removes the emergency, and prevents the administrative prosecution.[3]

That factual dispute means qualified immunity is not appropriate: qualified immunity does not protect actions that violate clearly-established rights, *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987), and the actions here might, depending on a jury's resolution of disputed facts, violate clearly established rights.

Without qualified immunity, absolute immunity—which is harder to obtain—is also unavailable. Absolute immunity is fundamentally incompatible with constitutional order: it negates the remedy and so obliterates the right. *Imbler v. Pachtman*, 424 U.S. 409, 433–34 (1976) (White, J., concurring in the judgment) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 243 (1974)) ("[To] extend absolute immunity to any group of state officials is to negate Pro tanto the very remedy which it appears Congress sought to create [with § 1983]."). So, while absolute immunity does exist, it

---

[3] That is not the only way a reasonable jury could find for the Mabes: one could credit their argument that there was no "emergency" threatening the children when one was in hospital and the other two were safe with their grandmother. (Pls.' R. to DCS 13–14, ECF No. 231.) And, contrariwise, a jury could find against the Mabes' argument that the defendants should have believed their innocent explanation on the night in question and still find the continued detention of the children was unreasonable. *See Hernandez*, 657 F.3d at 479–80 (additional facts can cause probable cause to "dissipate"). But it only takes one possibility to survive summary judgment.

is disfavored, *Burns v. Reed*, 500 U.S. 478, 487 (1991), and any argument for its extension must be advanced and convincingly demonstrated by the proponent, *Malley v. Briggs*, 475 U.S. 335, 340 (1986) (citing *Butz v. Economou*, 438 U.S. 478, 506 (1978)).  The Supreme Court has never held that DCS employees are entitled to absolute immunity, *Hoffman v. Harris*, 511 U.S. 1060 (1994) (Thomas, J., dissenting from denial of cert.), and it makes clear that any extension of the doctrine must be rooted in a common-law immunity existing in 1871, when § 1983 was enacted, *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993); *Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring); *Hoffman*, 511 U.S. at 1060.  There are, after all, no immunity exceptions in the law as Congress wrote it.  *Buckley*, 509 U.S. at 268. As this Court previously discussed, (Order 24–26, ECF No. 107), the Seventh Circuit has only once, in *Millspaugh v. Cnty. Dep't of Pub. Welfare*, considered immunity doctrine in the DCS context.  937 F.2d 1172, 1176 (7th Cir. 1991).  There, the Seventh Circuit relied on analogies with criminal prosecutions to extend absolute immunity to certain in-court behavior by DCS workers.   The analogy between criminal prosecution and DCS proceedings is imperfect, not least because so much of a DCS intervention is done administratively, with minimal procedural protections for the accused and with the agency itself serving as investigator, prosecutor, and judge.  And *Millspaugh* did not analyze the historic precedent for social-worker immunity, which intervening Supreme Court cases demand.  In practice, then, the continued vitality of *Millspaugh* is questionable; the Seventh Circuit has decided subsequent DCS cases without analyzing absolute immunity, even where it would have disposed of the case.

*See Hernandez*, 657 F.3d at 486–87 (finding triable issue of fact on procedural due process claim that DCS workers misrepresented facts in state court hearings); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1021 (7th Cir. 2000) (same). And this Court "must follow what the [Seventh Circuit] does, and not just what it says, especially when what it says is not altogether consistent from case to case." *Hall v. Simcox*, 766 F.2d 1171, 1174 (7th Cir. 1985). DCS and Dr. Thompson have not made the clear showing that would justify this Court's extension of absolute immunity—in contravention of § 1983 as enacted by Congress—to a novel context.

Even if *Millspaugh* does remain in force, factual disputes make it impossible to tell which of the Mabes' claims would fall under its grant of immunity. As the Court detailed in its earlier Order, (ECF No. 107 at 25), that case preserves a distinction between investigative and prosecutorial functions, with only the latter entitled to absolute immunity. *Cf. Kalina*, 522 U.S. at 132 (Scalia, J., concurring) (explaining how the "function" approach uneasily approximates, but fails to replicate, the contours of 1871 immunity law). The line between investigation and prosecution can be unclear at any time, *Manning v. Miller*, 355 F.3d 1028, 1031 (7th Cir. 2004) ("The law regarding immunity is very fact dependent, and the various facts courts have considered reveal a spectrum of behavior that has ultimately been categorized as immune or not immune."), and is especially so here, where DCS investigates and prosecutes all at once. If a jury finds the Mabes' contentions credible, DCS' post-detention scramble to justify its July 2019 actions could be regarded as an after-the-fact investigation—more of a police function, so not absolutely immune—or it could

agree with DCS, which characterizes that time as mere elaboration of a prosecution already begun—which would be absolutely immune.

In sum, a jury that agreed with the Mabes on key credibility disputes would be able to find violations of clearly established rights that occurred outside of any colorable claim to qualified or absolute immunity.  The factual dispute precludes summary judgment on immunity grounds.

### C.  Responsibility

The remaining question is whom among the defendants a jury could properly hold responsible if it were to find constitutional violations here.   Only those "whose conduct is 'fairly attributable to the State' can be sued as a state actor under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).   And among state actors, only those who are personally responsible for the constitutional tort can be held to account for it.  *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

Here, the DCS employees are state actors for certain.  Dr. Thompson claims she is not a state actor; the Mabes move for summary judgment on this sole issue, claiming that she is.  The Court already analyzed the issue on the motions to dismiss, (Order 17–22, ECF No. 107), and that analysis remains valid at this later procedural stage.  Whether or not Dr. Thompson actually is, or may be "fairly treated" as, a state actor is a fact-intensive question.  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001); *L.P. v. Marian Cath. High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (state actor determination rests on evidence of concerted

SA 011

action between state and individual).  Here the Court needs jury factfinding to resolve the dispute.  On the one hand, Dr. Thompson claims to have dealt with the injured Mabes child only in her role as a treating physician at a private hospital.  On the other hand, she came to the case as a child abuse evaluator through a special state-university investigative team and worked closely with DCS in preparing and prosecuting their investigation.  A reasonable jury could take those facts either way. *See, e.g.*, *Goetz v. Mt. Sinai Hosp. Corp.*, No. 91 C 5723, 1992 WL 162975 (N.D. Ill. July 7, 1992) (contrasting mere "medical examinations" with "investigation of suspected child abuse, a function which traditionally has been the exclusive prerogative of the state").  No summary judgment is appropriate in either direction.

As to personal responsibility, DCS argues that Lyman was the sole employee involved in the emergency seizure of the Mabes children; that Lyman and Davis were the only employees involved in preparing the "preliminary inquiry"[4] and CHINS petition; and that McFeeley and Lyman were the only employees involved in making the "substantiations."  (DCS Br. Supp. M. Sum. J. 21–22, ECF No. 210.)  The record does not support those arguments.  Oakes and Davis were the DCS employees handling the initial investigation of the Mabes on the night of the emergency. (Preliminary Inquiry 4–5, ECF No. 209-13.)  The results of Oakes' investigation went into the preliminary inquiry.  (*Id.*)  McFeeley took Davis' input in preparing her "substantiations."  (McFeeley Decl. 1, ECF No. 208-3.)  Because "an official causes a

---

[4] "Preliminary inquiry" is another bit of DCS jargon that belies its actual nature.  The "inquiry" is not an inquiry but an affidavit of facts supporting the charges ("substantiations") DCS wants to prosecute.

SA 012

constitutional violation if [s]he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights," she can be held responsible "if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Brokaw*, 235 F.3d at 1012.   The DCS investigation, accusation, prosecution, and appeal form one sequence of events.   That sequence was potentially foreseeable by the DCS employees and by Dr. Thompson as a regular collaborator, so a jury could properly find that the participants in the initial stages were responsible for the later.   *Id.*   DCS has not shown that any of its employees may be excused on summary judgment.

## IV.   Conclusion

Preclusion doctrines do not forestall this case.   On the merits, material factual disputes require jury resolution.   Summary judgment is inappropriate, and the motions seeking it, (ECF Nos. 188, 207, 213), are **denied.**

**SO ORDERED.**

Date: 12/22/2023

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

13

SA 013

Distribution:

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Brad A. Catlin
Williams Law Group, LLC
brad@williamsgroup.law

Stephanie L. Gutwein
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
stephanie.gutwein@faegredrinker.com

Ryan Michael Hurley
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
ryan.hurley@Faegredrinker.com

Paul Owen Mullin
LEWIS AND WILKINS LLP (Indianapolis)
mullin@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

Ronald J. Waicukauski
Williams Law Group, LLC
ron@williamsgroup.law

Liam Williams
Faegre Drinker Biddle & Reath LLP
liam.williams@faegredrinker.com

William Dean Young
Lewis And Wilkins LLP
young@lewisandwilkins.com

SA 014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ERIKA MABES, | ) | |
| BRIAN MABES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-02062-JRS-DLP |
| | ) | |
| ANGELA MCFEELEY, | ) | |
| NATASHA DAVIS, | ) | |
| COURTNEY OAKES, | ) | |
| SAMANTHA KING, | ) | |
| HANNAH LYMAN, | ) | |
| KRISTIN MILLER, | ) | |
| COURTNEY CROWE, | ) | |
| JACLYN ALLEMON, | ) | |
| SHANNON THOMPSON, | ) | |
| INDIANA UNIVERSITY HEALTH, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Motions to Dismiss**

## I.    Introduction

This is a civil rights action under 42 U.S.C. § 1983.  Plaintiffs Erika and Brian

Mabes, asserting claims on their own behalf and on behalf of their three minor

children, L.M., J.R.M., and J.A.M., allege that they were deprived of their Fourth and

Fourteenth Amendment rights in a sequence of events that began when the Indiana

Department of Child Services ("DCS"), acting in part on medical advice from Indiana

University Health employee Dr. Shannon Thompson, took custody of the Mabes

children without prior court order.  The named Defendants form three groups.  First

are the employees of the Hendricks County division of DCS who are, collectively, the

"DCS Defendants": Angela McFeeley, Natasha Davis, Samantha King, Hannah Lyman, Kristin Miller, Courtney Crowe, Jaclyn Allemon, and Courtney Oakes. Second is Dr. Shannon Thompson, who provided medical opinions to DCS. Third is Indiana University Health ("IU Health"), the hospital that employed Thompson.

In response to the Plaintiffs' Complaint, (ECF No. 1), all three Defendants have filed Motions to Dismiss, which variously assert affirmative defenses and deficiencies in the Complaint. Before the Court now, then, are the DCS Defendants' Motion to Dismiss, (ECF No. 28), Thompson's Motion to Dismiss, (ECF No. 31), and IU Health's Motion to Dismiss, (ECF No. 26). Also before the Court is a subsidiary dispute about the timeliness of the Plaintiffs' responses to the Motions to Dismiss. This dispute is raised by IU Health's Motion to Strike Response, (ECF No. 54), and the Plaintiffs reply with a Motion for Leave to File Belated Responses, (ECF No. 55).

## II.    Timeliness

The Court begins with IU Health's Motion to Strike Plaintiffs' Response. (ECF No. 54.) The deadline for Plaintiffs' Response to IU Health's Motion to Dismiss was Saturday, November 13, 2021, and the deadline for Plaintiffs' Response to the DCS Defendants' Motion to Dismiss was Sunday, November 14. (ECF No. 43 at 1–2.) Noting that these deadlines fell on the weekend, Plaintiffs' counsel's legal assistant put on their calendar that the responses were due Monday, November 15, the next business day. (Webb Decl. ¶ 4, ECF No. 55-1.) While this was error—the deadlines were fixed dates and not computed time periods under Rule 6(a)—the Court finds the one- and two-day-late filings, which caused no prejudice to IU Health or the DCS

2

Defendants, were a result of "excusable neglect" and should be accepted as timely filed. Fed. R. Civ. P. 6(b)(1)(B); *see, e.g.*, *Edwards-Brown v. Crete-Monee 201-U Sch. Dist.*, 491 F. App'x 744, 747 (7th Cir. 2012) (giving "missed filing deadlines" as example of excusable neglect under Rule 60(b)(1)). Accordingly, IU Health's Motion to Strike, (ECF No. 54), is denied, and Plaintiffs' Motion for Leave to File Their Belated Responses, (ECF No. 55), is granted.

## III.   Legal Standard on Motion to Dismiss

The three Motions to Dismiss before the Court are brought under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A Rule 12(b)(6) motion tests 'the legal sufficiency of a complaint,' as measured against the standards of Rule 8(a)." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020) (citing *Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 526 (7th Cir. 2015)). Rule 8(a) requires that the complaint contain a short and plain statement showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). "To meet this standard, a plaintiff is not required to include 'detailed factual allegations,'" but the factual allegations must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When considering a motion to dismiss for failure to state a claim, courts "take all the factual allegations in the complaint as true," *Iqbal*, 556 U.S. at 678, and draw all reasonable

inferences in the plaintiff's favor, *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). Courts need not, however, accept the truth of legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

That said, "the bar to survive a motion to dismiss is not high." *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873 (7th Cir. 2022) (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010)). "[A] plaintiff 'receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.'" *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) (quoting *Twombly*, 550 U.S. at 563).

## IV. Background

The following narrative is drawn from the Complaint, (ECF No. 1), the allegations in which are, for 12(b)(6) purposes, accepted as true.

Plaintiffs Erika and Brian Mabes are a married couple with three minor children, J.A.M., L.M., and J.R.M. (Compl. ¶ 1, ECF No. 1.)

On July 19, 2019, Brian dozed off while watching the children; when he awoke, he noticed that L.M. was "breathing funny." (*Id.* ¶ 36.) He tried to rouse L.M. When that failed, he alerted Erika. The parents then called 911, and L.M. was taken to the emergency room at Hendricks Regional Health. (*Id.* ¶¶ 36–37.) The doctors there gave L.M. a paralytic to stop his seizures. (*Id.* ¶ 41.) The paralytic stopped his vital functions as well, and the doctors took too long to intubate him. (*Id.* ¶ 41.) For twelve minutes L.M. had no oxygen to his brain. (*Id.* ¶ 41.) The doctors eventually revived L.M. with infant CPR. (*Id.* ¶ 42.) He was left with severe hypoxic brain damage,

minor rib fractures, and an abdominal bruise.  (*Id.* ¶ 44.)  He stabilized and was then transferred by Lifeline helicopter to the Riley Hospital for Children.  (*Id.* ¶ 46.)

When L.M. arrived at Riley in the early morning hours of July 20, 2019, the treating doctors saw an infant in critical condition.  They alerted DCS.  (*Id.* ¶ 59.) DCS assigned Defendants Natasha Davis and Courtney Oakes to investigate.  (*Id.* ¶ 61.)  They interviewed Erika, who told them of L.M.'s treatment at Hendricks.  (*Id.* ¶ 62.)  The DCS investigators did not follow up on that story.  (*Id.* ¶ 64.)  Instead, Oakes went with Brian Mabes and a police detective to the Mabes house.  (*Id.* ¶ 70.)  There they found marijuana.  (*Id.* ¶ 71.)  Brian said it was his, for medical use, and that he never used it around the children.  (*Id.* ¶¶ 72, 75.)  (Oakes, though, later reported that he had admitted using the marijuana around the children.  (*Id.* ¶ 78.))

Meanwhile, Riley assigned Defendant Dr. Shannon Thompson to assist DCS with their medical evaluation of L.M.  (*Id.* ¶ 84.)  Thompson and a DCS investigator interviewed Erika, and Erika again described L.M.'s treatment at Hendricks.  (*Id.* ¶¶ 87, 90.)  Thompson did not follow up on that story.  (*Id.* ¶ 92.)  Instead, Thompson concluded that L.M.'s injuries came from physical abuse and unsafe sleep.  (*Id.* ¶¶ 110, 113, 119.)  She reported her conclusion to DCS.  (*Id.* ¶ 129.)  Thompson also decided to investigate L.M.'s siblings, J.R.M. and J.A.M., for potential abuse.  (*Id.* ¶¶ 130, 133.)  A physical exam of J.A.M. turned up no symptoms.  (*Id.* ¶ 136.)  Initial x-rays of J.R.M. showed nothing suspicious, but Thompson ordered further x-rays, from which she concluded, against a colleague's opinion, that J.R.M. might have been abused.  (*Id.* ¶¶ 138–41.)  She reported her conclusions to DCS.  (*Id.* ¶ 141.)  DCS

then took custody of all three Mabes children without a court order.  (*Id.* ¶ 149.)  L.M. remained in the hospital; the parents' visitation rights were curtailed.  (*Id.* ¶ 159.)

On July 22, 2019, DCS filed a 'verified petition and report' with a Hendricks County court, seeking to have the Mabes children declared 'children in need of services' aka 'CHINS'.  (*Id.* ¶ 163.)  The petition and accompanying 'preliminary inquiry' relied on Thompson's medical opinions and Brian's supposed confession of using marijuana around the children.  (*Id.* ¶¶ 165–97.)  The state court held a detention hearing, at which the DCS investigators testified, and the court approved DCS' detention of the children.  (*Id.* ¶¶ 198–206.)

The state in October 2019 started its administrative review of the DCS-Mabes case.  (*Id.* ¶¶ 198–206.)  That review included a meeting between Erika Mabes and a DCS administrator on October 22, 2019, and a substantiation hearing on October 25, 2019.  (*Id.* ¶¶ 234, 238.)  Appeals followed.  (*Id.* ¶¶ 241–48.)

DCS continued its wardship of J.A.M. until March 6, 2020, and its wardship of L.M. and J.R.M. until May 29, 2020.  (*Id.* ¶ 227.)

## V.   DCS Defendants

The DCS Defendants' Motion to Dismiss, (ECF No. 28), asserts three grounds for dismissal: (1) that the whole case is barred by claim preclusion; (2) that any dispute over the constitutionality of the DCS Defendants' conduct is barred by issue preclusion; and (3) that the DCS Defendants are entitled to qualified immunity.  The Court will address these arguments in turn.

Before considering the arguments, though, a procedural matter must be addressed: the DCS Defendants purport to bring their motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, (ECF No. 29, p.1), but none of the grounds asserted in the motion directly addresses the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Instead, DCS has taken the opportunity to raise three affirmative defenses, which, normally, are to be raised in a responsive pleading. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 n.1 (7th Cir. 2012). "With a narrow and pragmatic exception for a plaintiff who has pleaded herself out of court, the appropriate vehicle for resolving an affirmative defense is a motion for judgment on the pleadings under Rule 12(c), not a Rule 12(b)(6) motion." *Gunn*, 968 F.3d at 806 (citing *Burton v. Ghosh*, 961 F.3d 960, 964–65 (7th Cir. 2020) (collecting cases)). The Court might in other circumstances have considered converting the motion *sua sponte* to a Rule 12(c) motion for judgment on the pleadings, or even a Rule 56 motion for summary judgment. But because in this case there is no answer, no other pleadings, and as yet no evidentiary record, there is no practical use to converting the motion to a more appropriate basis. The Court will therefore proceed to address the DCS Defendants' Motion to Dismiss under 12(b)(6) standards, even though the arguments there advanced are ill-suited to this stage of the proceedings.

a. Claim and Issue Preclusion

Generally, claim and issue preclusion work to prevent re-litigation of matters that were decided, or could have been decided, in a previous suit. *Lucky Brand Dungarees,*

*Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020). Preclusion doctrines apply to § 1983 actions. *Allen v. McCurry*, 449 U.S. 90, 96 (1980). To invoke preclusion, of course, there must have been a previous suit.

Here, DCS attached to its Motion to Dismiss an exhibit purporting to show the existence of a previous suit. (ECF No. 30.) As noted above, this is procedural error; the correct course would have been to introduce the necessary evidence and then bring a Rule 12(c) motion for judgment on the pleadings. *Carr v. Tillery*, 591 F.3d 909, 913 (7th Cir. 2010). But the procedural quibble is moot here because Magistrate Judge Pryor has ordered the exhibit stricken from the record. (ECF No. 86.) The Court, accordingly, will not consider it now.

The DCS Defendants have made no response to Magistrate Judge Pryor's order striking the exhibit on which their arguments principally rely. This Court is therefore unsure whether they expect their preclusion defenses still to be considered on their Motion to Dismiss. Without exhibit evidence of a previous suit, the DCS Defendants have but two routes to show that preclusion may apply: the first is judicial notice; the second is the Complaint itself.

The Court may take judicial notice of other courts' proceedings when evaluating preclusion defenses, *Mandarino v. Pollard*, 718 F.2d 845, 849 (7th Cir. 1983), even when those defenses are improperly asserted on a 12(b)(6) motion, *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). The Court may also grant dismissal on an affirmative defense that is "apparent in the plaintiff's complaint itself." *Burton*, 961 F.3d at 965 (citing *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008)). That

SA 022

rule applies only when "a plaintiff pleads himself out of court by making allegations that unambiguously establish that a claim is barred by an affirmative defense." *McCormick v. Goebel*, No. 3:19-CV-608 JD, 2020 WL 2197858, at *4 (N.D. Ind. May 6, 2020) (citing *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016))

Here, neither route avails. Following Magistrate Judge Pryor, the Court declines to take judicial notice of any state court records that may bear on this case. The Court equally declines to find a preclusion defense apparent on the face of the Complaint. Three reasons underpin the Court's decision: (1) the proceedings of Indiana's juvenile courts are confidential, so no public record is available for this Court's notice without a records request; (2) the parties mention the July 22, 2019, CHINS hearing but do not specify what claims were or could have been brought there, nor whether a final judgment resulted to preclusive effect; (3) the parties disagree in their description of the October 25, 2019 proceedings, such that the Court once again cannot determine with any specificity the preclusive result.

In sum, there is simply too little in the pleadings for the Court to determine, at this early stage, whether the DCS Defendants' preclusion defenses have merit.

### b.  Qualified Immunity

The DCS Defendants argue that they are entitled to qualified immunity at least for the pre-hearing detention of the Mabes children and for the initiation of CHINS proceedings. (Def.'s Mot. Dismiss 13, ECF No. 29.) They do not apparently address the Mabes' claims regarding the later substantiation hearings.

Qualified immunity protects the discretionary actions of executive officers from later suit, unless those actions violate a right that was clearly established at the time of the alleged violation. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987). Qualified immunity is an affirmative defense, and the burden of pleading it is on the defendant. *Crawford-El v. Britton*, 523 U.S. 574, 586–87 (1998). That said, "though it is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (citing *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)). The plaintiff's burden is easier to bear at the 12(b)(6) stage, where factual allegations are taken as true, so "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Hanson v. LeVan*, 967 F.3d 584, 597 (7th Cir. 2020) (quoting *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001)); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."). There is no heightened pleading standard for qualified immunity purposes—the plaintiff is not expected to anticipatorily rebut the defense in the initial complaint. *Hanson*, 967 F.3d at 597 (citing *Jacobs*, 215 F.3d at 765 n.3). Therefore, "dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiffs' well-pleaded allegations, taken as true, do not 'state a claim of violation of clearly established law.'" *Hanson*, 967 F.3d at 590 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)). Put otherwise, the motion to dismiss will not be granted where "(1) the plaintiffs adequately alleged facts that, if true, would constitute a violation

of a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the alleged violation, such that a reasonable public official would have known his conduct was unlawful." *Hanson*, 967 F.3d at 592.

The DCS Defendants' qualified immunity argument amounts to a contention that, according to their story, they behaved "reasonably." (Def.'s Mot. Dismiss 13, ECF No. 29.)  The Court reiterates that on a 12(b)(6) motion to dismiss the allegations in the Complaint are taken as true; the DCS Defendants' version of the story carries no weight; their argument is therefore inapposite.  Nonetheless, the Court is willing to consider the qualified immunity defense raised, however cursorily, and the burden shifts to the Mabes to show that the DCS Defendants are not immune.

As the Mabes tell it, the DCS Defendants seized the Mabes children (Compl. ¶¶ 149–50. ECF No. 1) without court order, exigent circumstances, or probable cause (*Id.* ¶¶ 151–57)—in the process ignoring plausible alternate explanations (*Id.* ¶¶ 62–65) and relying on obviously flawed medical advice (*Id.* ¶¶ 90–92, 96–106)—then lied to the state court when seeking after-the-fact ratification of their actions (*Id.* ¶¶ 163–205) and later botched the administrative review process to prolong the wrongful detention beyond any acceptable bounds (*Id.* ¶¶ 228–32, 237, 242–48.).  In that account the Court spots at least three violations that, as alleged, overcome the qualified immunity defense.

### i.  Fourteenth Amendment Substantive Due Process

First, there is a clearly established Fourteenth Amendment right to familial relations without government interference.  *Hernandez ex rel. Hernandez v. Foster*,

SA 025

657 F.3d 463, 478 (7th Cir. 2011). "A family's right to remain together without the coercive interference of the awesome power of the state is the most essential and basic aspect of familial privacy. . . . The fundamental right to familial relations is an aspect of substantive due process." *Id.* (cleaned up). Usually, infringements on fundamental rights are reviewed with strict scrutiny. *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) (citing *Clark v. Jeter*, 486 U.S. 456, 461 (1988)) ("It is well established that when a fundamental constitutional right is at stake, courts are to employ the exacting strict scrutiny test."). And, indeed, the Seventh Circuit once used a balancing test, borrowed from a Fourth Amendment context, to weigh the government's interest in child protection interventions against the family's fundamental right to be free from interference. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000) ("The balance here . . . is no different than that developed in the Fourth Amendment context."); *Heck*, 327 F.3d at 520 ("[W]e are required to consider: (1) the nature of the privacy interest upon which the action taken by the State intrudes; (2) the character of the intrusion that is complained of; (3) the nature and immediacy of the governmental concern at issue; and (4) the efficacy of the means employed by the government for meeting this concern."). That balancing test was only employed after the state had established an interest in intervention: without a reasonable suspicion of abuse, the state has no business interfering at all. *Brokaw*, 235 F.3d at 1019. Even to open an investigation of abuse would, in the absence of reasonable suspicion, constitute a violation of the fundamental right to family integrity. *Heck*, 327 F.3d 492, 520. The Circuit has since

12

moved from that framework,[1] and now holds that "[c]aseworkers must have 'some definite and articulable evidence giving rise to a reasonable suspicion' of past or imminent danger of abuse before they may take a child into protective custody." *Hernandez*, 657 F.3d at 478 (quoting *Brokaw*, 235 F.3d at 1019 and citing *Siliven v. Indiana Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011)). Reasonable suspicion is a low bar. "A reasonable suspicion requires more than a hunch but less than probable cause." *Siliven*, 635 F.3d at 928. Reasonable suspicion "is assessed considering the totality of the circumstances and common-sensical judgments and inferences about human behavior." *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (quoting *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005)).

Even with the low bar set by the Seventh Circuit here, the Mabes have alleged a violation of their right. The Mabes allege that DCS opened their investigation because of L.M.'s injuries, (Compl. ¶ 60, ECF No. 1), but that Erika Mabes was on the scene to explain to the DCS investigators the non-abusive (in fact—her word—"iatrogenic") cause of those injuries, (*id.* ¶ 62). As the Mabes would have it, any reasonable investigator in those circumstances would have promptly checked up on

---

[1] The history of this move, for those curious, seems to be as follows: in *Terry v. Richardson*, 346 F.3d 781 (7th Cir. 2003), the court cited *Brokaw* for the proposition that "caseworkers who come between parents and their children—for example, by taking protective custody of the children—must have evidence to support a 'reasonable suspicion' of past or imminent abuse." *Id.* at 787. *Brokaw* supports the idea that caseworkers must have reasonable suspicion to "come between parents and children" in the first instance. But under the *Brokaw* balancing framework, so drastic an intervention as "taking protective custody" would require far more than reasonable suspicion. The infelicitous example used in *Terry* made no difference there, where the court had only to consider a lesser state intervention that was amply justified by the circumstances. Later cases, though, picked up *Terry* for the proposition that the state needs only reasonable suspicion to take protective custody of children. *See Siliven v. Indiana Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011); *Hernandez*, 657 F.3d at 478. That is a lower bar than is usual for fundamental rights analyses, but in *Hernandez*, the latest Seventh Circuit case to address the issue, the court considered and dismissed a revision to its new reasonable suspicion standard. *Hernandez*, 657 F.3d at 479.

SA 027

the story, found independent verification in the Hendricks hospital records, and closed the case. (*Id.* ¶¶ 63–65.) The investigation would not have included a search of the home, (*id.* ¶ 70), and the DCS investigator would have had no further grounds for reasonable suspicion to detain the Mabes children. Any such detention violated the family's right to carry on free from state interference. The Mabes allege a continuing detention from July 20, 2019, to at least November 22, 2019. (*Id.* ¶¶ 4–5.) Therefore, under the facts as alleged, the Mabes have shown a violation of a clearly established right. At the 12(b)(6) stage they need do no more.

ii. Fourth Amendment Search and Seizure

Second, the children have a clearly established Fourth Amendment right protecting them from unreasonable custody seizures. *Brokaw*, 235 F.3d at 1010. "[A] seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Siliven*, 635 F.3d at 926 (quoting *Brokaw*, 235 F.3d at 1010). Not every allegation of abuse constitutes emergency, and the opportunity to investigate and to hear alternate explanations cuts against a finding of emergency. *Brokaw*, 235 F.3d at 1011. Probable cause likewise requires reasonable investigation under the circumstances. *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). Here, the Mabes have alleged a violation for much the same reason as described above: where there is an easily verifiable, innocent explanation for the injuries that prompted DCS investigation, there was no emergency and no probable cause for further state involvement. *Cf. Evans v. Torres*,

14

No. 94 C 1078, 1996 WL 5319, at *4–5 (N.D. Ill. Jan. 4, 1996) (finding no qualified immunity on motion to dismiss where caseworker allegedly ignored cooperative parents' explanations and made emergency seizure without further investigation).

### iii.   Fourteenth Amendment Procedural Due Process

Third, there is a clearly established Fourteenth Amendment right to fair process in post-deprivation child custody hearings. *Brokaw*, 235 F.3d at 1020.  "Familial relations" are a liberty interest protected by the Due Process clause. *Id.* Parents are entitled to an "opportunity . . . to be heard at a meaningful time and in a meaningful manner." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  Although the requisite process can be fact-specific, the lower bounds are clear.  "[D]ue process 'requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents.'" *Hernandez*, 657 F.3d at 486 (quoting *Brokaw*, 235 F.3d at 1020).  And "sham procedures do not satisfy due process." *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 503 (7th Cir.1999).  Here, the Mabes allege that the DCS Defendants presented false and misleading information in state court, (Compl. ¶¶ 163–205, ECF No. 1), in order to secure the court's after-the-fact approval of the detention, (*Id.* ¶ 206).  The Mabes do not allege that they had any chance to be heard at that proceeding.  Furthermore, the Court is willing to entertain the thought that some post-deprivation hearings, even where the parents are present, might not amount to due process if DCS remains in custody of the children.  The

SA 029

allegations, then, do not show that due process was accorded.  That is a violation of the Mabes' due process rights sufficient to withstand the 12(b)(6) motion to dismiss.

The Court, well aware that these constitutional issues are invariably fact-intensive, has no wish to indulge in further speculation as to which constellations of fact and circumstance might later prove to be constitutional violations.  All the Court has at present is the Complaint.  There, the Mabes sufficiently allege facts that together "state a claim of violation of clearly established law." *Behrens*, 516 U.S. at 306.  The DCS Defendants' qualified immunity argument, attempting to dispute the facts, is premature and so fails.

The Court holds that none of the three grounds supporting the DCS Defendants' Motion to Dismiss succeeds; that Motion, (ECF No. 28), is therefore denied.

## VI.   Dr. Thompson

In her Motion to Dismiss, Thompson asserts (1) that she is not a state actor amenable to suit under § 1983, (2) that she is absolutely immune from suit, and (3) that she is entitled to qualified immunity.

### a.  State Action

Thompson first asserts that she is not a state actor and therefore is not a proper § 1983 defendant.  (Def.'s Mot. Dismiss 8, ECF No. 32)

Only those acting "under color of" law can be held liable under § 1983.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970).  And "in a § 1983 action . . . the statutory requirement of action 'under color of state law' and the 'state action' requirement of

SA 030

the Fourteenth Amendment are identical." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  State action implies a state actor, who is usually a "state official," *id.*, but can be a private individual: "anyone whose conduct is 'fairly attributable to the State' can be sued as a state actor under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting *Lugar*, 457 U.S. at 937).

Thompson, then, will be a proper § 1983 defendant if either (1) she is a state official, in which case she is taking state action in the performance of her duties or (2) she is a private actor, but her conduct is nonetheless fairly attributable to the state.  The parties disagree sharply on the first case.  The Mabes initially alleged that Thompson was a private doctor working for a private hospital, (Compl. ¶ 21, ECF No. 1), but later filed a supplemental pleading, (ECF No. 92), in which they allege that Thompson was in fact an IU School of Medicine employee, therefore a public university employee, therefore a state official.  Thompson, in response, (ECF No. 95), objects to the supplemental pleading and would have this Court consider only the allegations in the initial Complaint.  For now, though, the Court can bypass the dispute and consider instead the second case: whether Thompson, even as a private employee, might have been a state actor.

The Supreme Court gives the standard: "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, (2001).  Applying the standard is not easy:

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient.
>
> . . .
>
> . . . [E]xamples may be the best teachers.

*Id.* at 295–96.  Conveniently, the Court has examples available.  The parties agree on a handful of factually analogous in-circuit cases that are relevant to the Court's inquiry here—though of course they disagree on how those cases ought to be applied. None is mandatory, all are persuasive.  In reverse chronological order, these are: *Hayes v. Narang*, No. 19-CV-03596, 2020 WL 4815909 (N.D. Ill. Aug. 18, 2020); *Dickman v. Rosado*, No. 16 C 9448, 2019 WL 3728698 (N.D. Ill. Aug. 1, 2019); *C.H. v. Grossman*, No. 14 C 8174, 2015 WL 4554774 (N.D. Ill. July 28, 2015); *Mohil v. Glick*, 842 F. Supp. 2d 1072 (N.D. Ill. 2012); *Boyko v. Parkview Hosp. Inc.*, No. 1:10 CV 260, 2012 WL 3527373 (N.D. Ind. Aug. 14, 2012); *Rangel v. Reynolds*, 607 F. Supp. 2d 911 (N.D. Ind. 2009); *Turner v. Chicago Police Dep't*, No. 98 C 0122, 1998 WL 483508 (N.D. Ill. Aug. 10, 1998); *Evans v. Torres*, No. 94 C 1078, 1996 WL 5319 (N.D. Ill. Jan. 4, 1996); and *Goetz v. Mt. Sinai Hosp. Corp.*, No. 91 C 5723, 1992 WL 162975 (N.D. Ill. July 7, 1992).

The Court has considered the above cases.  In *Evans*, the court was asked to determine whether a privately employed doctor was a state actor when that doctor made a medical evaluation at DCFS request as part of an ongoing child abuse investigation.  (DCFS is the Illinois analogue of Indiana's DCS.)  The Court, writing before *Brentwood*, held that the doctor was not a state actor, reasoning first that

18

"hospitals and their employees who report suspected child abuse are not state actors simply because they are legally required to cooperate with the state" and second that the existence of a "'contract' or 'agreement' is insufficient to constitute state action." *Evans*, 1996 WL 5319 at *5, *7.  Those two propositions—call them the "legal-compliance" proposition and the "contract" proposition—have then trickled into subsequent cases.

In *Rangel*, the court was asked to consider whether two privately employed health care workers were state actors when they conducted a medical evaluation at DCFS request as part of an ongoing child abuse investigation.  *Rangel*, 607 F. Supp 2d. at 927.  The court held that the workers were not state actors without further discussion, citing *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), for the proposition that a report of child abuse is not state action and *Evans* for the contract proposition. *Id.*  In *Dickman*, the court was asked to consider whether two doctors on a hospital's child abuse investigation team were state actors when they routinely diagnose, report, and recommend action to DCFS.  *Dickman*, 2019 WL 3728698 at *2.  The court held that the doctors were not state actors, without further reasoning and citing only *Evans* for the legal-compliance proposition.  *Id.*  In *Hayes*, the court considered whether two health care workers on a hospital's child abuse pediatric team, who routinely investigated for and reported to DCFS, were state actors.  *Hayes*, 2020 WL 4815909 at *7.  The court held that they were not, because the medical evaluations given in the case were not "at the direction or under the control of DCFS." *Id.* (relying on the pre-*Brentwood* reasoning in *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), that

SA 033

a private nursing home's decision to discharge or transfer Medicaid patients was not state action where that decision rested on the nursing home's own medical judgment). The court then discussed this same line of cases and noted that the majority follow the *Evans* rationale: "medical professionals who report child abuse, whether or not that duty is also embodied in a contractual arrangement, are not state actors where DCFS does not control or direct their medical examinations." *Id.* (citing *Evans*, 1996 WL 5319, at *5–*8).

The Court recognizes the close factual resemblance between those cases and this, but the Court is not persuaded that the *Evans* propositions have so far been applied correctly. To see why, consider the present case. The Mabes allege that when L.M. presented at Riley in critical condition, some unnamed "Riley personnel" first "contacted DCS." (Compl. ¶ 59, ECF No. 1.) That contact was the initial report required by state law—and it is safe to say, with *Evans*, that the report did not make the reporter into a state actor. But that does not matter here, where the reporter was apparently not Thompson, and, even if it were, a mere report is not all the Mabes allege. Once the DCS investigation was underway, Thompson was "charged with performing [an] investigation" by her employer, Riley. (*Id.* ¶ 84.) The Mabes allege the existence of a contract between DCS and Riley to perform such investigations, (*id.* ¶ 84), a contention that Thompson dismisses as conclusory. But the contract, if there be one, does not matter. Say, with *Evans*, that the existence of a contract is non-dispositive. The Mabes further allege that Thompson went with "a DCS employee" to interview Erika Mabes, (*id.* ¶ 87), and later reported to DCS the results

20

of her medical investigation of L.M., (*id.* ¶¶ 96, 100, 104).  The Mabes allege that Thompson concluded, and reported to DCS, that L.M.'s injuries were due to abuse. (*Id.* ¶¶ 127, 129.)  And they allege that Thompson ordered medical evaluations of the other Mabes children to evaluate them for abuse.  (*Id.* ¶¶ 133–38.)  These supplemental evaluations took at least five days to conclude, (*id.* ¶ 139), and when Thompson had looked at the results, she again communicated with DCS, (*id.* ¶¶ 141–42).

Working from the above allegations, it is hard to see how Thompson could be described as anything other than a medical investigator for DCS.  Why?  She was not, or not merely, an initial reporter.  DCS knew of the case before she was involved.  She was brought in to give a medical opinion for DCS.  Her medical evaluation was "at the direction" of DCS even if its contents were not "under the[ir] control."  *Hayes*, 2020 WL 4815909 at *7.  She interacted with the Mabes only as an investigator, never as a treating doctor.  She reported to DCS, and her work benefited them, not her private employer.  Her work continued after DCS had decided to seize the children and any necessity for emergency action had gone.  All of the above alleged facts combine to shape the Court's judgment here.  The countervailing fact—that Thompson remained nominally a Riley employee—matters little; the state has apparently deputized its investigatory function.  The Court need not speculate why Riley is willing to carry on that function—perhaps by contract, perhaps under some belief as to their obligations under the law, perhaps gratuitously out of a charitable desire to assist the state agency in its mission.  The Court need only consider whether,

SA 035

under the "close nexus" and "fairly attributable" test announced in *Brentwood*, the actions of Thompson amount to state action. The Court holds they do. In this, the Court agrees with *Goetz*, 1992 WL 162975, at *8 (N.D. Ill. July 7, 1992) (finding state action by private hospital where defendants contend "their conduct was to provide medical examinations" merely, but the court considers they "participated in the investigation of suspected child abuse, a function which traditionally has been the exclusive prerogative of the state") and *Mohil*, 842 F. Supp. 2d at 1077 (finding state action by doctor in private hospital's child protection team when that team functions as "staff doctors (who would by definition have been 'state actors')" for "the governmental task in the field of child abuse").

Because the Court holds that the Complaint alleges a sufficiently close nexus between DCS and Thompson to render her a state actor, the Court need not address the parties' dispute over the Supplemental Response, (ECF No. 92). Thompson is a proper § 1983 defendant whether or not she is, as the Mabes later allege, a state employee.

b. Absolute Immunity

Thompson next asserts that she has absolute immunity. (Def.'s Mot. Dismiss 11–14, ECF No. 32.)

Absolute immunity is strong medicine. *Imbler v. Pachtman*, 424 U.S. 409, 433–34 (1976) (White, J., concurring in the judgment) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 243 (1974)) ("[To] extend absolute immunity to any group of state officials is to negate Pro tanto the very remedy which it appears Congress sought to create [with

§ 1983]").  Its application is therefore disfavored, *Burns v. Reed*, 500 U.S. 478, 487 (1991), and any argument for its extension must be advanced and convincingly demonstrated by the proponent, *Malley v. Briggs*, 475 U.S. 335, 340 (1986) (citing *Butz v. Economou*, 438 U.S. 478, 506 (1978)).  Otherwise, "qualified immunity represents the norm." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)).

The Supreme Court has not addressed absolute immunity for social workers. *Hoffman v. Harris*, 511 U.S. 1060 (1994) (Thomas, J., dissenting from denial of cert.). Instead, the Circuit Courts have been left to interpret and apply the Supreme Court's other absolute immunity cases in the social work context.  Two types of absolute immunity are relevant.  These apply to functions, not persons.  *Burns*, 500 U.S. at 486.  First, witness immunity protects testimony given at trial.  *Briscoe v. LaHue*, 460 U.S. 325 (1983).  Witness immunity also applies to testimony equivalents given before trial, including depositions, *Nwoke v. Palmer*, 116 F. App'x 761, 763–64 (7th Cir. 2004), and expert witness reports, *Buckley v. Fitzsimmons*, 919 F.2d 1230 (7th Cir.1990), *rev'd in part on other grounds*, 509 U.S. 259 (1993).  Second, prosecutorial immunity, aka quasi-judicial immunity, protects the actions of prosecutors initiating and carrying out criminal prosecutions.  *Imbler*, 424 U.S. 409.  Prosecutorial immunity extends to certain pretrial functions of prosecutors in their capacity as advocates for the state, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), but does not extend to prosecutors' investigative and administrative functions, *id.* (citing *Burns*, 500 U.S. at 494–96).  Nor do expert witnesses have immunity while collaborating with prosecutorial investigations.  *Stinson v. Gauger*, 868 F.3d 516, 528

(7th Cir. 2017).  And, despite bearing some resemblance to prosecutors, police officers do not have absolute immunity when applying for warrants.  *See Malley v. Briggs*, 475 U.S. 335 (1986).

The Seventh Circuit has only once applied the above law to a social work context. In *Millspaugh v. County Department of Public Welfare of Wabash County*, 937 F.2d 1172 (7th Cir. 1991), the court considered the immunity defenses available to a child protection caseworker sued under § 1983.  The court held that the caseworker had absolute immunity for her in-court conduct.  *Millspaugh*, 937 F.2d at 1175 (specifically, the caseworker had absolute immunity from allegations that she "(1) failed to furnish the court with material that would have been favorable to parental custody, (2) pursued the litigation after it should have been clear that the mothers were entitled to custody, (3) pursued the litigation for an improper motive, and (4) neglected to ensure that the mothers received adequate notice of hearings.").  The court announced that in so finding, it "agree[d] with decisions holding that social workers and like public officials are entitled to absolute immunity in child custody cases on account of testimony and other steps taken to present the case for decision by the court."  *Id.* at 1176.  The court then held that the caseworker had only qualified immunity for her "application for the order initiating the case[] and her journey to Indianapolis to obtain custody of the children."  *Id.* at 1176.  The court reasoned that "the application for the initial order was much like a police officer's affidavit seeking a search warrant, which we know from *Malley v. Briggs* . . . falls outside the scope of absolute immunity."  *Millspaugh*, 937 F.2d at 1176.

SA 038

Other courts in this circuit have cited *Millspaugh* to support a blanket holding of absolute immunity for child protection workers.  *See Boyko v. Parkview Hosp. Inc.*, No. 1:10 CV 260, 2012 WL 3527373, at *7 (N.D. Ind. Aug. 14, 2012); *Vanwinkle v. Nichols*, No. 115CV01082JMSMJD, 2015 WL 9275671, at *9 (S.D. Ind. Dec. 18, 2015).  This Court, too, has suggested in dicta that *Millspaugh* might so hold.  *Bos. v. Indiana Dep't of Child Servs.*, No. 119CV03279JRSMPB, 2021 WL 795452, at *7 (S.D. Ind. Mar. 2, 2021).  Those cases, though, all relied on the same language: that "social workers . . . are entitled to absolute immunity in child custody cases on account of . . . steps taken to present the case for decision by the court."  *Millspaugh*, 937 F.2d at 1176.  And, when applying that language alone, it is easy to conclude that almost any activity by child protection workers or their associates will enjoy absolute immunity—because in child protection cases, all roads lead to court.  On a more considered reading of *Millspaugh*, though, it becomes clear that the court did not with that language intend to do more than restate the basic rules of *Imbler*, *Buckley*, and *Burns* on prosecutorial immunity, which, as those cases show, is not limited to the witness immunity for "testimony" but also includes some other "steps taken to present the case."  *Id.*  (A look at the specific allegations in question supports that reading: the allegations all concern the actual conduct of litigation in the custody case, not, for example, the evaluation and investigation of initial reports of abuse.)  The *Millspaugh* court carefully preserved the distinction between those absolute immunities and the lesser qualified immunity that, following *Malley*, applies to the "application for the order initiating the case."  *Id.*  It is therefore a mistake to read the "other steps"

language, expansive as it seems, to override prevailing absolute immunity law. To the contrary, *Millspaugh* affirms absolute immunity for testimonial and prosecutorial functions but dictates no absolute immunity for social workers in the "application for the order initiating the case." *Id.*

Here the Court has three acts to analyze. The Mabes' claims against Thompson arise, first, from her medical evaluation of L.M. and the allegedly false and misleading information she gave to DCS as they decided to take custody of the Mabes children on July 20, 2019. (Compl. ¶¶ 82–148, ECF No. 1.) Second, the Mabes allege that those false and misleading statements were the basis for DCS' verified petition and report initiating CHINS proceedings on July 22, 2019. (*Id.* ¶¶ 163–206.) And third, the Mabes allege that Thompson testified falsely at a July 31, 2019, state court hearing. (*Id.* ¶¶ 208–10.)

The Court rules as follows: (1) Thompson's medical evaluation of L.M. on July 20, and her opinions reported therefrom, are not entitled to absolute immunity. There was no judicial proceeding of any sort—criminal, civil, or administrative—then in train, so she could not yet be characterized as a witness, and there is no suggestion that she exercised any prosecutorial function. Nor will the investigation be retroactively classified as testimony or trial preparation because it was later used in the custody proceedings. *Buckley*, 509 U.S. at 275–76. (2) The inclusion of Thompson's medical opinions in the verified petition and report of July 22 is not entitled to absolute immunity. This is the *Malley v. Briggs* scenario, as applied to social workers by *Millspaugh*. *Millspaugh*, 937 F.2d at 1176. The Court considers

26

the verified petition and report to be the "application for the order initiating the case." *Id.* (3) Thompson's testimony at the July 31 hearing is entitled to absolute immunity. This is the *Briscoe* witness immunity rule, as applied to ex parte child custody hearings by *Millspaugh*. *Id.*

Those claims arising from Thompson's testimony on July 31 are therefore dismissed.

Those claims relating to Thompson's pre-hearing conduct survive. The Court will proceed with them to evaluate Thompson's next asserted grounds for dismissal.

### c.   Qualified Immunity

Finally, Thompson claims qualified immunity. (Def.'s Mot. Dismiss 14, ECF No. 32.) She is permitted to raise this defense whether or not she is a state employee. *Filarsky v. Delia*, 566 U.S. 377, 389 (2012).

As described more fully in Section V.b, above, qualified immunity is rarely appropriate on a motion to dismiss. The Court will not dismiss where "(1) the plaintiffs adequately alleged facts that, if true, would constitute a violation of a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the alleged violation, such that a reasonable public official would have known his conduct was unlawful." *Hanson*, 967 F.3d at 592. Thompson argues, first, that the Complaint does not connect her personally with any constitutional violation and, second, that no alleged violation concerns a clearly established right. The Court treats these arguments in reverse order.

i. Violation of a Clearly Established Right

Thompson can only be responsible for a constitutional violation if one in fact occurred.  Because the Court has addressed this issue for the DCS Defendants in Section V.b.i-iii, above, there is no need to belabor the point.  The Mabes allege several violations of their clearly established constitutional rights.   At least three are relevant here:

1. a Fourteenth Amendment substantive due process right to familial relations without government interference, allegedly violated when DCS unjustifiably took custody of the Mabes children;

2. a Fourth Amendment right to be free from unreasonable seizures, violated by the same action; and

3. a Fourteenth Amendment procedural due process right to fair post-deprivation hearings, violated by the false 'verified petition and report' that DCS submitted to the court.

Thompson argues "no applicable legal authority establishes that it is unconstitutional for a doctor who suspects that a child is a victim of abuse or neglect to report that information to the relevant state authorities, even if the doctor's opinion is based on incomplete or incorrect information." (Thompson Br. Supp. 18, ECF No. 32.)  Here, though, as the Court discusses in Section VI.a, above, the Mabes allege Thompson did more than make an initial report.  "Plaintiffs can demonstrate clearly established law by proving that the defendant's conduct was 'so egregious and unreasonable that . . . no reasonable official could have thought [s]he was acting

28

lawfully." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 724 (7th Cir. 2013)).  Taking the Mabes' allegations as true, Thompson's conduct was "egregious": she connived with DCS to remove the Mabes children from their parents and to procure a bogus court order justifying that removal.

The alleged violations are each sufficient to survive a 12(b)(6) motion to dismiss. The next question is whether Thompson had any part in them.

### ii.  Personal Responsibility

The basic formulation of the test for liability under 42 U.S.C. § 1983 has two prongs: first, a Constitutional deprivation, and second, a state actor.  *See, e.g.*, *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1009 (7th Cir. 2000) ("In order to state a claim under Section 1983, a plaintiff must allege that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law.") (citing *Starnes v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir.1994)).  There is, however, a third requirement, which is so commonsensical as in the majority of cases to escape notice: the defendant must be the one actually responsible for the deprivation—otherwise, it is the wrong defendant.  This test is variously described as a "cause" test, *see, e.g.*, *Brokaw*, 235 F.3d at 1012 ("To establish personal liability in a § 1983 action, the plaintiff must show that the government officer caused the deprivation of a federal right") (quoting *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir.1999)); a "personal responsibility" test, *see, e.g.*, *Crowder v. Lash*, 687 F.2d 996, 1005–06 (7th Cir. 1982) ("To recover damages

under 42 U.S.C. § 1983, a plaintiff must establish defendants' personal responsibility for the claimed deprivation of a constitutional right.") (quoting *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981)); or a "personal involvement" test, *see, e.g.*, *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation") (quoting *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010)).  Under whichever description, the underlying requirement is that of personal responsibility and fault.  *Id.* (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)).  "An official satisfies the personal responsibility required of § 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Brokaw*, 235 F.3d at 1012 (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir.1985)).

As alleged, Thompson's conduct satisfies that standard.  A tight causal chain links Thompson's medical evaluation with the subsequent events.  The Mabes allege that Thompson knew she was working on a child abuse investigation, (Compl. ¶ 143, ECF No. 1), and that she knew DCS would rely on her report, (*id.* ¶ 145).  They allege that Thompson lied to DCS in her report.  (*Id.* ¶ 147.)  A doctor who lies to DCS is responsible for the subsequent constitutional torts, which are, if not complete at the moment of the lie, at least easily foreseeable.  *Cf. Brokaw*, 235 F.3d at 1014 (citing *Morris v. Dearborne*, 181 F.3d 657 (5th Cir.1999)) (creator of false report of abuse was "moving force behind the removal of children" and so responsible for the alleged constitutional violations).  The allegedly falsified report justified the whole DCS

intervention.  Without it, there would have been no seizure, no interference with family relations, and no deficiency in the state court process (which, indeed, would not have begun at all).  The Court therefore concludes that the Complaint sufficiently alleges Thompson's personal responsibility for the constitutional violations arising from the pre-hearing seizure of the Mabes children and the false 'verified petition and report' used at the CHINS hearing of July 22, 2019.

The Court's analysis differs for the constitutional violations the Mabes allege in the preparation for and conduct of the October 25, 2019, substantiation hearing. (Compl. ¶¶ 264–66, ECF. No. 1.)  Thompson seems to have played no role in that proceeding.  Her allegedly falsified report is still a cause in fact, but the state's conduct of its administrative affairs is far enough removed from Thompson's July behavior to free her from personal responsibility.  She is not in charge of DCS' administrative review.  And if she were at the hearing as a witness, she would of course be protected by absolute witness immunity.  *Briscoe v. LaHue*, 460 U.S. 325 (1983).

In conclusion, then, Thompson's Motion to Dismiss, (ECF No. 31), is granted in part and denied in part.  The Motion is granted as to the claims that relate to Thompson's testimony at the July 31, 2019, hearing and Thompson's involvement, if any, with the October 2019 substantiation proceedings.  The Motion is denied as to the claims that relate to Thompson's medical evaluation of L.M., the alleged DCS

seizure of the Mabes children, and the 'verified petition and report' filed in the CHINS hearing.

## VII.  IU Health

IU Health is the corporation that operates Riley Hospital for Children.  (Compl. ¶ 18, ECF No. 1.)  Plaintiffs' allegations against IU Health boil down to an argument that IU Health should be held responsible for the actions of Thompson, its employee. (*Id.* ¶ 18 ("Pursuant to 42 U.S.C. § 1983, IU Health is a state actor by virtue of the close nexus between the State of Indiana and the challenged conduct of IU Health's employee, Thompson, which was performed within the scope of her employment."); Pls.' Resp. 20, ECF No. 53 (arguing that IU Health was a state actor because Thompson was a state actor).)  Plaintiffs argue that "under traditional *respondeat superior* principles, IU Health would be liable for Dr. Thompson's actions—it employed Dr. Thompson and her investigation was part of her duties at Riley." (Pls.' Resp. 13–14, ECF No. 53.)

This argument fails: "[r]*espondeat superior* liability does not apply to private corporations under § 1983." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014).  "[A] private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Id.*  Plaintiffs acknowledge this controlling precedent and concede that they have not alleged IU Health has any such unconstitutional custom or policy. (Pl.'s Resp. 11, ECF No. 53 ("[I]t is true that the Seventh Circuit's current precedent

precludes a finding that a private corporation is liable for the constitutional violations of its employees . . . .").)  That should settle the matter.

Nevertheless, Plaintiffs "urge that this Court follow the Supreme Court's guidance in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), and recognize that private corporations can be vicariously liable for any constitutional violations that their employees commit in the course and scope of their work."  (Pl.'s Resp. 13, ECF No. 53.)

*Adickes* "indicated that a private corporation could be held liable under § 1983 on a theory of *respondeat superior* liability." *Shields*, 746 F.3d at 790.  But *Adickes* was decided before *Monell*, and *Monell* disavowed *respondeat superior* liability and announced the policy or custom requirement.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 n.7, 694 (1978).  *Monell* dealt with suits against municipalities, not private corporations, but both the Seventh Circuit and "[a]ll other circuits that have addressed the issue" have extended the *Monell* standard to private corporations. *Shields*, 746 F.3d at 790.  It is true that *Shields*, in considerable detail, questioned this extension.  746 F.3d at 790–95.  Plaintiffs latch on to *Adickes* and the criticism in *Shields* to argue that this Court should hold IU Health responsible for Thompson's actions under a *respondeat superior* theory.  But "[f]or now, this circuit's case law still extends *Monell* from municipalities to private corporations," and "it would take a decision by [the Seventh Circuit] sitting en banc or pursuant to Circuit Rule 40(e), or a decision by the Supreme Court to overrule those decisions." *Shields*, 746 F.3d at 796, 789.  No such decision has been made, *see Dean v. Wexford Health Sources, Inc.*,

18 F. 4th 214, 235 (7th Cir. 2021) (continuing to apply policy or custom requirement), and "district judges must follow the decisions of [the Seventh Circuit] whether or not they agree," *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

Because binding precedent forecloses a finding of *respondeat superior* liability against IU Health, IU Health's Motion to Dismiss, (ECF No. 26), is granted, and the Court need not address IU Health's alternative arguments for dismissal.

**VIII.  Conclusion**

IU Health's Motion to Strike, (ECF No. 54), is **denied**, and Plaintiffs' Motion for Leave to File Their Belated Responses, (ECF No. 55), is **granted**.

The DCS Defendants' Motion to Dismiss, (ECF No. 28), is **denied**.

Dr. Shannon Thompson's Motion to Dismiss, (ECF No. 31), is **granted in part** and **denied in part:**

The Motion is **granted** as to the claims concerning Thompson's testimony at the July 31, 2019, hearing and Thompson's involvement, if any, in the October 2019 substantiation proceedings.  Those claims are **dismissed without prejudice.**

The Motion is otherwise **denied.**

IU Health's Motion to Dismiss, (ECF No. 26), is **granted**, and the associated claims are **dismissed without prejudice.**

The clerk is **directed** to terminate IU Health from the docket.

SA 048

**SO ORDERED.**

Date: 09/22/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to registered counsel of record

SA 049

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Justin F. Roebel
Justin F. Roebel
Deputy Attorney General

OFFICE OF THE INDIANA ATTORNEY GENERAL
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Telephone: (317) ) 232-7635
Fax: (317) 232-7979
Justin.roebel@atg.in.gov